**CITY OF AUSTIN, Appellant,**

**v.**

**HOUSTON LIGHTING & POWER COMPANY and Houston Industries, Inc., Appellees.**

No. 05–89–01354–CV.

Court of Appeals of Texas, Dallas.

Oct. 7, 1992.

Rehearing Denied Nov. 18, 1992.

Fulbright & Jaworski, Roger Townsend, Ronald J. Palmer, Ben Taylor, Jeff Dykes, Jeffrey S. Wolff, Houston, Carrington, Coleman, Sloman & Blumenthal, James E. Coleman, Marvin S. Sloman, Dallas, Liddell, Sapp, Zivley, Hill & Laboon, John L. Hill, Jr., Roy Atwood, Houston, City of Austin, Iris J. Jones, Acting City Atty., John T. Gooding II, Mark G. Yudof, Austin, for appellant.

Graves, Dougherty, Hearon & Moody, Robert J. Hearon, Jr., Thomas B. Hudson, Jr., Matthew G. Dore, Michael Diehl, Selden W. Bobbitt, Austin, Baker & Botts, Finis E. Cowan, J. Gregory Copeland, Houston, Baker & Botts, Joe R. Greenhill, Minton, Burton, Foster & Collins, Roy Q. Minton, Martha S. Dickie, Austin, for appellees.

Before THOMAS, KINKEADE and OVARD, JJ.

## OPINION

KINKEADE, Justice.

City of Austin (Austin) appeals a take-nothing judgment rendered in favor of Houston Lighting & Power Company and its parent company, Houston Industries, Inc. (collectively HL & P), in this action for breach of a contract to build a nuclear power plant, fraud, and violation of the Deceptive Trade Practices Act (DTPA). In six points of error, Austin argues that the trial court erred by (1) sustaining HL & P's special exceptions to Austin's cause of action for breach of the implied duty to perform the contract with skill and care, (2) overruling Austin's hearsay objections to the admission of several newspaper articles, (3) refusing Austin's requested jury questions and instructions, (4) overruling Austin's objections to jury question two, and (5) overruling Austin's motion for new trial. HL & P raises what it characterizes as two conditional cross-points, but what this Court would term counterpoints. *See Jackson v. Ewton,* 411 S.W.2d 715, 717 (Tex.1967); *Ragsdale v. Progressive Voters League,* 743 S.W.2d 338, 342 (Tex.App.—Dallas 1987), *rev'd on other grounds,*790 S.W.2d 77 (Tex.1990). HL & P argues that we should affirm the trial court's judgment because there is no evidence that any failure by HL & P to provide information caused any cost increase and because Austin is not a "consumer" as to HL & P as defined by the DTPA. Because the trial court did not err by (1) granting HL & P's special exceptions, (2) admitting the news-

paper articles, (3) refusing to submit Austin's requested jury questions and instructions, (4) overruling Austin's objections to jury question two, and (5) denying Austin's motion for new trial, we overrule all of Austin's points of error and need not address HL & P's cross-points in which HL & P asks only for affirmance. We affirm the trial court's judgment.

## FACTUAL HISTORY

The Lower Colorado River Authority (LCRA), Central Power & Light (CP & L), the City of San Antonio (San Antonio), Austin, and HL & P all belong to the South Texas Interconnected Systems. Formed in the 1940's, this interconnected group provides for the sharing of electricity in emergencies and the staggered building of additional units to the individual systems to take advantage of each other's generation powers. On July 14, 1971, the group met and discussed for the first time the possibility of building a jointly owned nuclear power plant.

On December 14, 1971, all of the participants in this interconnected entered into a preliminary agreement to share the costs of studies to determine the feasibility of licensing, constructing, and operating a jointly owned two-unit nuclear powered electric generating plant. The group formed a study committee, which employed the Nuclear Utilities Systems Corporation to conduct feasibility studies. Upon completion of these feasibility studies, each participant would decide whether to agree to participate and build the South Texas Project (the project).

In its report presented to the study committee on January 13, 1972, Nuclear Utilities Systems estimated that it would take twenty-two staff members of HL & P to handle the project and estimated the cost of the project at $902 million for both units. The report also projected October 1, 1980, as the completion date for unit one and March 1, 1982, for unit two. Having tentatively decided, after receiving this report, to build a jointly owned nuclear power plant and wanting to avoid delays in proceeding with preliminary work pending completion and execution of a participation agreement, all of the participants entered into an interim agreement on June 15, 1972. In this agreement, the participants chose HL & P as the project manager. HL & P agreed to serve as the project manager without compensation, except for the reimbursement of project-related expenses, including overhead. In the construction of a nuclear power plant, regulations require the project manager to act as licensee and to represent the project before the Nuclear Regulatory Commission (NRC).

In September 1972, LCRA and Austin decided not to participate in the project. On September 6, 1972, LCRA authorities passed a resolution not to participate in the project because they felt that nuclear power plants were still in the experimental stage and that the economics of such plants were questionable. Austin chose not to participate because its voters did not approve the bonds for the project.

On July 1, 1973, San Antonio, CP & L, and HL & P executed the participation agreement, which provided for the joint licensing, construction, operation, and maintenance of the project. Each participant owned an undivided interest as follows: San Antonio, thirty percent (30%); CP & L, thirty percent (30%); and HL & P, forty percent (40%). Under the participation agreement, the owners agreed to share all costs proportionately. The agreement provided for a management committee, composed of an officer or general manager from each participant, and a project manager. The agreement also provided that the project manager could be removed by a simple majority vote.

As project manager, HL & P's responsibility included hiring an Architect/Engineer(A/E)-constructor to design and build the plant. In June 1972, after an allegedly intensive investigation, HL & P tentatively recommended Brown & Root to the study committee for the position of A/E-constructor on the project. Before making a final commitment to hire Brown & Root, however, HL & P wanted to further test Brown & Root's capabilities by having it do additional site-study work for the project and assist

in developing the specifications for the project's nuclear steam supply system. The steam supply system takes the steam produced by the heat from the nuclear reactor and transfers it to the turbine generator, which in turn rotates and produces electricity.

On June 11, 1974, after Brown & Root completed these tasks to all of the participants' satisfaction, HL & P and Brown & Root signed a contract in which Brown & Root agreed to act as the A/E-constructor for the project. Brown & Root contracted for a fixed profit, or "cost plus" basis, and the contract required it to complete ninety percent of the total engineering work before starting construction. All of the participants previously had employed Brown & Root to perform various construction projects and were satisfied with its work. They also knew that Brown & Root had no previous nuclear experience and that this was the first nuclear power plant Brown & Root had contracted to design and build.

Brown & Root's responsibilities as A/E-constructor included aiding HL & P in evaluating and selecting the steam supply system unit for the project. At the July 13, 1973 management committee meeting, HL & P discussed in detail its and Brown & Root's bid analyses and recommended the selection of the Westinghouse 3800 unit based on Westinghouse's final contract. The participants accepted HL & P's recommendation and signed a contract with Westinghouse in 1974.

### Austin's Entry into the Project

In late 1972 and early 1973, Austin began experiencing problems with fuel availability. Austin relied entirely on natural gas for its electricity generation. On May 24, 1973, the Austin City Council received a report from the mayor's Energy Study Commission, which recommended that Austin participate in a joint venture for the development of coal or lignite power or a joint venture for a nuclear power plant. It did not specifically recommend that Austin participate in the project.

In a November 1973 bond election, Austin voters approved $161 million for Austin to participate in the project. On December 14, 1973, Austin's representative, R.L. Hancock, began attending the management committee meetings. At that meeting, he received all the back copies of the management committee's meeting minutes. Austin never asked about the contents of the previous meeting minutes or for any other documents before signing the participation agreement. On December 21, 1973, Austin joined the other participants in the project by executing the first amendment to the participation agreement. With the execution of the amendment, Austin became a sixteen percent undivided interest owner with the three other cotenants. The entry of Austin into the project reapportioned the other participants' undivided interests as follows: San Antonio, 28%; CP & L, 25.2%; and HL & P, 30.8%.

At the time Austin entered the project, it knew that (1) the participants had chosen HL & P to act as project manager and that HL & P's only involvement with nuclear power plants was its recent experience with its Allens Creek project, (2) Brown & Root had signed a letter of intent to act as the A/E-constructor on a "cost plus" basis, and (3) the size of the steam supply system had been increased from 1150 megawatts to 1250 megawatts. Before entering the participation agreement, Austin made no inquiry into the selection process used in choosing the steam supply system, the budget, or Brown & Root's technical capability to perform the job. Austin asked only about the status of the contract with Brown & Root.

Between 1974 and 1979, the entire nuclear power industry changed. In 1974, Congress separated promotion of nuclear power from its regulation with the creation of the NRC. Once the NRC took over the regulatory function, safety requirements increased significantly. Between 1975 and 1979, the NRC issued new regulations about every two weeks. These regulations were partly in response to a 1975 fire that struck the Brown's Ferry nuclear plant in Alabama and the March 28, 1979 accident that occurred at the Three Mile Island nuclear plant in Pennsylvania. As a result of

a series of investigations of the Three Mile Island accident, the NRC toughened its enforcement of regulations and regulatory guides at all nuclear plants. The NRC stopped all licensing reviews, shut down all plants with reactors similar to those at Three Mile Island for a period of time, and more rigidly interpreted its regulations.

### Construction of the Project

In January 1973, the project participants agreed on the final site selection in Matagorda County, just outside of Bay City, Texas. CP & L purchased the property, and, in December 1973, Brown & Root submitted its first cost and schedule estimate for the project. In May 1974, HL & P submitted the preliminary safety analysis report to the NRC. This ended the preliminary design phase. HL & P then turned its attention toward getting the limited work authorization, which HL & P needed in order to obtain a construction permit.

In June 1975, Brown & Root issued a revised preliminary construction cost estimate. This estimate projected an increase of costs from $1 billion to $1.27 billion. Concerned about this estimate, HL & P subjected Brown & Root to a thorough audit of its overall administration and management of the project. This audit identified many concerns as to Brown & Root's performance, including whether it could meet the scheduled operating dates. Although HL & P told Brown & Root of its concerns at that time, it did not inform the management committee of its discoveries. On August 4, 1975, HL & P sent a letter to the participants informing them that Brown & Root had not properly validated the cost estimate and expressed concern that the cost estimate was incorrect and needed modification.

In September 1975, pursuant to the limited work authorization permit received in August 1975, Brown & Root began clearing the plant site and performing other preliminary non-safety-related construction. After satisfying the NRC's requirements, the project received its construction permit, which allowed Brown & Root to begin safety-related construction in December 1975,

ten days ahead of schedule. In early 1976, in response to Brown & Root's complaints about Westinghouse's failure to produce design documents on time, HL & P hired an engineering consultant to determine how Westinghouse's many design changes to its 3800 unit affected the schedule. The audit showed that the changes had affected the schedule. HL & P shared the results of this audit with Westinghouse but not with the management committee.

### 1976 Decision to Start Safety–Related Construction

In 1971, based on the performance of A/E-constructors on other nuclear projects, Brown & Root estimated that it would take a total of one million engineering man-hours to complete the project's engineering work. By September, 22, 1975, this number had increased to almost 2 million, sixty percent of which Brown & Root had already used. At the March 1976 management committee meeting, Brown & Root represented that it had completed this percentage. The project, however, ultimately required fifteen to twenty million engineering man-hours. Therefore, in hindsight, Brown & Root actually had completed less than eight percent of the total engineering work eventually performed on the project.

At each monthly management committee meeting, HL & P provided the participants with (1) a monthly progress report, which included an engineering progress report, (2) a construction progress report, and (3) an executive summary report. These reports visually showed which items were on or behind schedule and provided a written explanation.

At the March 1976 management committee meeting, Brown & Root reported that its engineering and construction were both on schedule. When asked whether its engineering could support the construction schedule, Brown & Root's representative responded, "Hell, yes." After receiving this assurance from Brown & Root, the management committee voted to let safety-related construction begin. As noted earlier, Brown & Root already had started construction under a limited work authoriza-

tion in September 1975. It already had dug the hole for the reactor containment building, had started placing rebar, and had poured some nonpermanent structural concrete. In April 1976, Brown & Root began safety-related construction, which meant that it started pouring the concrete for the permanent structures.

### 1977 Management Analysis Company Audit

The project remained close to schedule for the next year. In 1977, however, Brown & Root fell behind the original schedule set for the project. In response, HL & P hired the Management Analysis Company, a managing consultant that advises utilities, pipeline companies, suppliers, A/Es, and constructors on financial planning matters as well as project construction and operations management. HL & P asked Management Analysis to perform an evaluation and audit of HL & P's project management organization and to identify problems that could critically impact the achievement of the project. Management Analysis presented its findings in a draft report to HL & P in June 1977. The report identified three major concerns: (1) project procurement; (2) the cost and schedule estimate; and (3) project organization, including policy and procedure manuals.

HL & P determined that the draft report furnished enough information to correct the problems and directed Management Analysis not to prepare a final report, though it felt that some of the information in the draft report was inaccurate. On June 10, 1977, HL & P gave an oral report to the management committee of Management Analysis's findings and the major items that HL & P thought it needed to pursue with corrective action. None of the committee members requested a copy of the written report. In response to the report, HL & P undertook several actions to carry out Management Analysis's recommendations. Also in response to the report, the management committee formed a task force composed of people from Brown & Root, HL & P, and Management Analy-

sis to develop a realistic cost and schedule estimate.

In September 1978, the task force presented an interim report, which added eighteen months to the schedule and estimated the final cost at $2 billion. The task force further determined that significant cost and schedule increases were necessary and that it needed six additional months to develop a more definitive estimate. HL & P sent Austin a copy of this report. In November 1978, HL & P met with Austin's mayor, its city council, assistants, and staff, and its Citizens' Electric Utility Commission at the airport in Houston to provide them with an update on the project. HL & P allegedly tried to answer questions and make Austin's representatives aware of the uncertain status of the estimates. Later, newspaper articles appeared in Austin newspapers discussing whether Austin's management committee representative had kept the city council sufficiently informed about the problems at the project. In August 1979, HL & P presented the task force's new, more definitive "baseline" cost estimate of $2.7 billion to the management committee. The committee, however, did not adopt the estimate until May 1980.

### 1980 NRC Show Cause Order.

The NRC requires the licensee of a nuclear power plant to set up and execute a quality assurance program. Quality assurance includes all those planned and systematic actions necessary to provide adequate confidence that a structural system or component will perform satisfactorily in service. Periodically, the NRC's inspection force looks at a project's construction activity records to determine whether that project is meeting the NRC's quality assurance requirements.

Between October 10, 1979 and February 7, 1980, the NRC investigated the project. The NRC determined that Brown & Root had not conducted certain quality assurance activities in compliance with the NRC's requirements. Although the deficiencies primarily resulted from Brown & Root's failure to carry out an effective quality assurance program, the NRC held

HL & P, as the project manager and licensee, responsible. The NRC served a notice of violation, imposed a $100,000 civil fine, and issued a show cause order on HL & P. The show cause order outlined the actions that HL & P needed to take to convince the NRC to allow the project's safety-related construction activities to continue uninterrupted. Although HL & P felt that several of the NRC's findings were inaccurate, it paid the fine without objection so it that could save money in the long run, continue the plant's construction, and maintain good relations with the NRC.

### Termination of Brown & Root as the A/E–Constructor

In September 1981, after Brown & Root reported that it expected to progress toward the completion date at a rate of only 0.5% per month for the next eighteen months, the management committee decided to remove Brown & Root as the A/E. In September 1981, Bechtel replaced Brown & Root as the A/E. After Brown & Root refused to remain in the limited capacity of constructor, HL & P replaced it in that capacity with Ebasco. At the time that Brown & Root left the project, the participants had spent $1.78 billion, $1 billion of which was accounted for by equipment and materials. When Bechtel took over, it presented a new cost estimate of $5.5 billion to complete the project. After taking over for Brown & Root, Bechtel's only major rework was to move the pipes coming from the cooling pond. To keep track of the cost of any rework, repairs, or regulatory charges that might have resulted from Brown & Root's mistakes, Bechtel set up a special account. Bechtel charged a total of $250 million to that account.

Between 1981 and 1988, Bechtel completed construction of the project. Unit one became operational in August 1988, and unit two became operational in June 1989. The final cost of the project was about $6.013 billion, an excess of $5 billion over the original $902 million Nuclear Utilities Systems study estimate. The number of HL & P staff needed to complete the project eventually peaked at 600, an increase of 578 personnel over the original study estimate of 22.

### PROCEDURAL HISTORY

In December 1981, the participants sued Brown & Root. They alleged that Brown & Root (1) was not qualified, (2) had breached its construction contract calling for performance to the highest standards, (3) had a deficient quality assurance program, and (4) had lied when it told the management committee that Brown & Root was ready to begin safety-related construction in April 1976. The participants recovered $750 million.

Austin then brought this suit against HL & P to recover its sixteen percent share of the cost overruns. Austin alleged breach of contract, fraud, and DTPA violations. Austin limited its complaints to the events that occurred between 1973 and 1981 while Brown & Root was the A/E-constructor on the project and during which the participants spent $1.78 billion. The trial court allowed the parties to use the discovery obtained in the earlier Brown & Root litigation.

Austin based its contract claims on two alternate theories. First, Austin asserted that, if HL & P had told the management committee in April 1976 that Brown & Root's engineering was inadequate to support construction at that time, the committee would have voted to delay construction to allow engineering to catch up and the plant could have been built for $3.2 billion. Second, Austin asserted that if HL & P had provided more information in 1978, the construction of the plant would have been deferred for a year and the plant could still have been built for $3.2 billion. HL & P defended by asserting that (1) the information that it allegedly withheld was frequently not information in the usual sense, but only hindsight opinions or speculations or unproved allegations from the Brown & Root litigation, (2) Austin provided no causal link between any failure of HL & P to provide information and any increase in the project's costs, (3) the $3.2 billion estimate was not attainable in any event, and (4) the project's actual cost and schedule was en-

tirely reasonable and could not have been improved upon even if further information had been provided.

Before trial, the parties filed numerous pretrial motions. Disposition of some of the motions required the court to interpret the participation agreement. In opinions accompanying its rulings on these motions, the trial court held that under the agreement the project's management lay with the management committee and that HL & P as project manager had the duty to supply information to the management committee on major matters and on significant factors affecting the project's cost and schedule. Based on one of these opinions, the court sustained HL & P's special exceptions to Austin's mismanagement claims that HL & P (1) had breached provisions of the Brown & Root and Westinghouse contracts, (2) had not exercised reasonable skill and care, (3) had breached fiduciary duties, and (4) had failed to perform as a prudent utility manager and struck those causes of action. During the trial, Austin asked the court to reconsider its sustaining of HL & P's special exceptions to Austin's mismanagement claims. The court overruled Austin's motion and issued another opinion standing by its earlier interpretations of the participation agreement.

The court's jury charge included questions as to breach of contract, fraudulent nondisclosure, and DTPA violations. The jury found that HL & P did not supply the owners with all of the information required under the participation agreement but that Austin incurred no additional costs on the project as a result of HL & P's failure to furnish the required information. As to fraud, the jury found that a relationship of trust and confidence existed between Austin and HL & P. The jury also found that HL & P did not fail to disclose specified matters with the intent to induce Austin to enter the participation agreement. As to the alleged DTPA violations, the jury found none occurred. Based on the jury's findings, the trial court entered a take-nothing judgment in HL & P's favor.

## DUTY OF IMPLIED SKILL AND CARE

In its first point of error, Austin contends that the trial court erred when it sustained HL & P's special exceptions and struck Austin's cause of action for HL & P's breach of its duty implied in law to perform with skill and care its obligations as project manager under the participation agreement. Austin argues that the trial court misconstrued the participation agreement when it found that the agreement did not impose this duty. For the reasons discussed below, we overrule Austin's first point of error.

### Standard of Review

■■■ The trial court has broad discretion in hearing, construing, and sustaining special exceptions. *Bader v. Cox,* 701 S.W.2d 677, 686 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The court, however, must liberally construe the pleading attacked and accept as true all material factual propositions alleged and all factual statements reasonably inferred from the allegations. *Id.* This Court will not disturb the trial court's rulings absent an abuse of discretion. *Bader,* 701 S.W.2d at 686.

HL & P specially excepted to Austin's fifth amended petition and moved to strike Austin's mismanagement claims that HL & P (1) did not exercise reasonable skill and care in the performance of its obligations under the participation agreement, (2) breached fiduciary duties, and (3) did not perform as a prudent utility manager. The trial court struck Austin's mismanagement claims based on the court's construction of the participation agreement.

■■■ On appeal, Austin does not argue that the participation agreement was ambiguous. When no ambiguity exists, the trial court construes the contract as a matter of law. *Westwind Exploration v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 381 (Tex.1985). To determine the contract's meaning, the court considers the wording of the instrument in light of the surrounding circumstances at the time the parties entered into it and applies the pertinent rules of construction. *City of Pinehurst v.*

*Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968). The court gives effect to the parties' intentions as expressed in the instrument. *Gracia v. RC Cola–7–Up Bottling Co.*, 667 S.W.2d 517, 520 (Tex. 1984). The parties' objective, not subjective, intent controls. *Pinehurst*, 432 S.W.2d at 518; *Dallas Bank & Trust Co. v. Frigiking, Inc.*, 692 S.W.2d 163, 166 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).

▆ Implied terms arise from the parties' presumed intentions as gathered from the instrument as a whole. *Summers v. Consolidated Capital Special Trust*, 783 S.W.2d 580, 583 (Tex.1989); *Danciger Oil & Ref. Co. v. Powell*, 137 Tex. 484, 490, 154 S.W.2d 632, 635 (1941); *Ingram Freezers v. Atchison, T. & S.F. Ry.*, 464 S.W.2d 915, 919 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.). It must appear either that the implied terms were so clearly within the parties' contemplation that they thought it unnecessary to express them or appear that it is necessary to infer the terms to carry out the contract's full purpose. *Danciger*, 154 S.W.2d at 635; *Ingram*, 464 S.W.2d at 919.

Existence of the Duty in Every Contract

▆ Austin argues that the trial court misconstrued the participation agreement because the duty of skill and care is implied in every contract regardless of the parties' intentions. To support this proposition, Austin relies on *Coulson v. Lake LBJ Municipal Utility District*, 734 S.W.2d 649, 651 (Tex.1987); *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947); and *Westbrook v. Watts*, 268 S.W.2d 694, 697 (Tex.Civ.App.—Waco 1954, writ ref'd n.r.e.). Austin relies on *Public Service Enterprise Group, Inc. v. Philadelphia Electric Co.*, 722 F.Supp. 184, 209 (D.N.J.1989) (*PECO*), to further argue that this implied duty applies to agreements to manage nuclear power plants. HL & P responds that a duty of skill and care exists in the participation agreement only if the parties intended to include it.

Austin misplaces its reliance on *Scharrenbeck, Coulson, Westbrook*, and *PECO*. None of these cases:

(1) involve an agreement among participants to share expenses,

(2) involve a duty by the managing participant to provide material information to the other cotenants,

(3) involve a management committee with budget and manpower control and the authority to replace the manager by a simple majority vote, or

(4) imply a duty to perform with reasonable skill and care where the parties expressed otherwise.

In *Scharrenbeck*, Montgomery Ward agreed to repair a water heater. After making the repairs, the repairman's failure to check the flue caused a fire that destroyed Scharrenbeck's home. Scharrenbeck sued for negligence, and Montgomery Ward asserted the absence of any duty owed to Scharrenbeck. The court held "[a]ccompanying every contract is a common law duty to perform with care, skill, reasonable expedience and faithfulness *the thing agreed to be done.*" *Scharrenbeck*, 204 S.W.2d at 510 (emphasis added). The court appears to hold that a duty to perform with skill and care attaches only to the performance of the acts the parties agreed to perform. This requires the trial court to make a determination of the parties' presumed intentions as gathered from the instrument as a whole. Austin fails to cite to any authority, and we can find none, that interprets *Scharrenbeck* to mean that this implied duty exists in every contract regardless of the parties' intentions. After a review of the whole contract, it is evident that the parties intended in this contract to place ultimate control of the project in an independent management committee and that HL & P's duty to perform with skill and care attached only to HL & P's duty to provide material information to that management committee.

In *Coulson*, an engineer contracted with the defendant to prepare plans and specifications to provide the defendant with utilities. The engineer prepared the plans and specifications, but the defendant refused to pay him. In its response to the engineer's subsequent suit, the defendant alleged that the plans "were not prepared in a good and

workmanlike manner and do not meet the standards of reasonable engineering practice." *Coulson*, 734 S.W.2d at 650. The parties asked the court to decide which party had the burden to prove negligent performance. The court held that an engineer was entitled to a presumption that the work he performed was good and workmanlike and not negligently done when he proved compliance with the express terms of his professional contract. In relation to this issue, the court cited the *Scharrenbeck* holding "that the common law duty to perform with skill and care accompanies every contract." *Id.* at 651. The court, however, did not hold that an implied duty existed regardless of the parties' intentions. In *Coulson*, the engineer expected compensation, and there is no indication that, under the contract, the defendant had the right to review the engineer's work. Here, HL & P received no compensation for its services, and the management committee reserved the right to review HL & P's work and to remove it as project manager.

In *Westbrook*, the court was asked to decide the correctness of a jury-charge definition of "good and workmanlike manner," an express term in the contract. In relation to that issue, the court stated, "[t]here is the general requirement applicable to all contracts where one is required to perform a service that it will be performed with reasonable care or skill." *Westbrook*, 268 S.W.2d at 697. The court, however, was not asked to and did not decide whether this duty existed regardless of the parties' intentions.

In *PECO*, the nuclear power plant owners sued PECO, the operating owner, for breach of contract, negligence, misrepresentation, and fraud in connection with the NRC's shutdown of the plant in 1987, after the NRC was informed that operators at the plant were routinely sleeping on duty. *PECO*, 722 F.Supp. at 186, 187. Although PECO received several warnings from the NRC in 1985 that the plant was not up to industry standards, PECO never passed along these criticisms to the other owners. *Id.* at 188–89. The joint operating agreement among the owners required PECO to "operate and maintain" the plant as an "independent contractor" responsible for the results obtained, and, in the agreement, PECO pledged to operate and maintain the station for the owners as if it were owned solely by PECO. *Id.* at 186. PECO agreed to provide these services without making a profit. *Id.* at 197. The agreement also established an owners' committee to coordinate the administration of all plant operation and maintenance matters and to review the plant's general performance and operations. The agreement further required PECO to provide a daily status report to the owners' committee. As the plant's licensed operator, PECO was responsible for the plant's safe operation and had a duty to follow the laws and regulations covering nuclear power plants. One of those regulations required the constant presence of a licensed or senior operator at the controls during the plant's operation. *Id.* at 188. The owners alleged that PECO's misrepresentations about the plant's operation prevented them from acting to prevent the plant's shutdown.

PECO moved to dismiss the owners' tort claims, alleging that the owners' breach of contract action precluded their tort cause of action. In determining whether the owners could maintain both causes of action, the court had to decide the source of PECO's duty to refrain from the complained-of conduct. The court held that, given the nature of PECO's contractual obligations to efficiently operate and maintain the plant and to keep the owners informed of the plant's status, "the contract could certainly be interpreted under Pennsylvania [law] to include an implied promise by PECO to render its services with reasonable skill and care." *Id.* at 209.

Here, although the participation agreement imposed upon HL & P duties similar to those imposed in PECO, it did not provide HL & P with "independent contractor" status or specifically state that HL & P was responsible for the results obtained. Without these additional obligations, it does not appear necessary to infer a duty of reasonable skill and care in the agreement, especially considering the agreement's provision that allows the manage-

ment committee to remove HL & P with a simple majority vote.

### "Best Judgment" Standard

▓▓ Austin next contends that the trial court misconstrued the participation agreement by rejecting Austin's argument that the agreement meant to deviate from the stricter reasonable skill and care standard only in the two limited instances where it expressly specified the lower "best judgment" standard. Austin argues that only when the parties have expressly rejected an "ordinary prudence" standard in favor of a "best judgment" standard will the courts remove the "prudent conduct" or "reasonable care" standard and impose a "best judgment" standard. Austin relies on *Anbeck Co. v. Zapata Corp.*, 641 S.W.2d 608 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.), to support its contention.

Austin misplaces its reliance on *Anbeck*. In *Anbeck*, the appellant argued that, because the parties' agreement gave the corporation the right to make all material decisions for the corporation's subsidiary, a corresponding legal duty to use "reasonable diligence" in its management of the subsidiary necessarily accompanied this right. Because the contract did not expressly provide for this obligation, the court needed to determine whether the written contract implied a covenant that the corporation would manage the subsidiary with reasonable diligence and due care. *Id.* at 611. The court found that the agreement included covenants only that the corporation would not use certain names in the corporation's subsidiary and that the corporation would use its best efforts to provide the subsidiary with up to $1,000,-000 in working capital. The court held that the agreement's use of "best efforts" in one limited instance did not imply a general duty to use reasonable skill and care. *Anbeck*, 641 S.W.2d at 613–14.

A similar situation existed here. The participation agreement required HL & P to make the day-to-day decisions for the project. The participation agreement, how-

ever, only specified a standard of performance in two limited situations:

(1) Section 10.2.8 of the agreement required the project manager to:

[f]ollow the practices and procedures which have been reviewed and approved by the Management Committee or, in the absence of such approved practices and procedures, which reflect the *best judgment* of the Project Manager.

(2) Section 24.1 of the agreement provided:

Pending the resolution of any dispute by arbitration or judicial proceedings, the Project Manager shall proceed with the Preconstruction Work, Construction Work, or Station Work in a manner consistent with this Participation Agreement and the Project Agreements and with the *best judgment* of the Project Manager. . . .

(Emphasis added.) Because the agreement did not expressly provide for a reasonable skill and care standard as urged by Austin, the court needed to determine whether the written contract implied such a covenant. Both of the cited provisions involve situations in which HL & P would be acting without the supervision of the management committee. Under the remaining provisions of the participation agreement, HL & P is subject to management committee supervision and review. We conclude, as did the trial court, that this limited use of the "best judgment" standard of performance does not necessarily imply a general duty to use reasonable skill and care under other parts of the contract.

### HL & P's Self–Interest

▓▓ Austin also contends that the trial court misconstrued the participation agreement by determining that, because of HL & P's status as part owner, it would be motivated by self-interest to perform well and that, therefore, a general duty to perform with reasonable skill and care need not be implied. Austin argues that HL & P's self-interest was not a sufficient motivator because HL & P received additional forms of compensation that the other owners did not. Austin asserts that HL & P (1)

charged the other owners $473 million for its diverse contractual services, (2) benefitted economically by spreading its internal costs among the other owners, (3) benefitted politically by virtue of the economic muscle it enjoyed as purchasing agent and the employer of several thousand workers, and (4) recouped its losses by increasing its rate base.

The evidence shows that:

(1) the participation agreement did not provide for the project manager to receive compensation for its services. Rather, the other participants agreed to pay their proportionate share of the actual costs incurred by HL & P as determined by independent audits, which neither Austin nor any of the other participants questioned, and

(2) HL & P could not simply pass along its cost increases to the public by increasing its rate base. To get a rate base increase, HL & P must prove to the Texas Public Utility Commission that its costs in building the project were prudently incurred rather than incurred through some mismanagement. *See* Application of Gulf State Utils. Co. for Authority to Change Rates, 14 Tex. PUC Bull. 1943, 2429 (1988) (interpreting §§ 2, 38, 39, and 41 of the Public Utility Regulatory Act, TEX.REV.CIV.STAT. ANN. art. 1446c (Vernon 1980 & Supp. 1992)).

The evidence does not show that:

(1) HL & P campaigned for or otherwise sought the job of project manager. Rather, the participants chose HL & P after consideration of the Nuclear Utilities Systems report, which recommended that HL & P act as project manager for the first project and that one of the other participants assume that duty for later projects,

(2) HL & P negotiated or bargained for increased political clout as the purchasing agent for the project. Further, the participation agreement provided for the removal of the project manager with a simple majority vote, or

(3) HL & P received any additional compensation for performing the duties of project manager.

Mutual Right of Control

 Austin additionally contends that the trial court erred when it analogized business relationships to this case and determined that an implied duty of skill and care did not apply in all contracts. Austin argues that the law of partnerships and joint ventures does not apply to this participation agreement because there was no mutual right of control. Austin relies on *State v. Houston Lighting & Power Co.,* 609 S.W.2d 263 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.), to support its contention.

In *Houston Lighting & Power Co.,* the parties asked the court to decide whether the cities of Austin and San Antonio were liable for ad valorem taxes on their undivided interests in the same project and under the same participation agreement as the one at issue in this lawsuit. *Id.* at 265. HL & P and CP & L had paid their share of the taxes. Austin and San Antonio refused to pay the taxes assessed against their interests in the properties comprising the project. The cities claimed an exemption because their interests in the project were devoted exclusively to public use. The State argued that the court for tax purposes should treat the project as a legal entity in the nature of a partnership or a joint venture, which is, itself, liable for 100 percent of the taxes assessed against the involved properties.

The court stated that a joint venture is like a partnership and is usually limited to one enterprise. The essential elements of a joint venture are (1) mutual right of control, (2) community of interest, (3) agreements to share profits as principals, and (4) agreements to share losses, costs, and expenses. *Id.* at 267. The court, limiting its analysis solely to whether the participants agreed to share profits, determined that they did not and as a result that no partnership or joint venture existed and that the project was not liable for the assessment or payment of any taxes against the

project. *Id.* at 268. Contrary to Austin's assertion that the court in that case found that the participation agreement showed no mutual right of control, the court did not discuss that element of partnership. Further, the court specifically stated in its review of the facts that the "[m]anagement is by a committee made up of one representative from each participant." *Id.* at 266. This finding refers to the management committee and implies a mutual right of control.

Because the participants did not agree to share profits as co-owners of the project, we agree with Austin that the project is neither a partnership nor a joint venture. We disagree, however, that the trial court's analogy to cases involving partnerships and joint ventures is inappropriate given Austin's contention that the duty to use reasonable skill and care is imposed in *all* contracts. As illustrated by the cases relied upon by the trial court,[1] that duty is not imposed in every instance. Those cases reveal that courts, in deciding not to impose such a duty upon partnerships and joint ventures, primarily rely on the partners' or joint venturers' mutual right to control the business or their agreement to share losses, costs, and expenses. Although the participants in the instant case did not agree to share profits as co-owners of the project, this element of a partnership or joint venture is not pertinent to this analogy. The participants met all of the other requirements of a partnership or joint venture: (1) a mutual right of control, (2) a community of interest, and (3) an agreement to share losses, costs, and expenses. The trial court, therefore, appro-

priately analogized to those types of business relationships to show that an implied duty to use reasonable skill and care does not exist in *every* contract.

### The Management Committee's Powers

■ Austin further contends that the trial court misconstrued the participation agreement because the management committee's powers are limited. Austin argues that the participation agreement does not grant the management committee the power to exercise "general supervision" over the project manager. Austin relies on sections 4.25 and 10.2.4 of the participation agreement for this proposition.

Section 4.25, the definition portion of the agreement, provides in part as follows:

> PROJECT MANAGER: The Participant responsible for the planning, construction and operation of the various components of the South Texas Project in accordance with this Participation Agreement and the Project Agreements.

This provision is a definition. It identifies the party with the responsibilities enumerated in section 10 of the agreement. This provision adds nothing to those responsibilities.

Section 10.2.4 of the agreement provides as follows:

> [The project manager shall] [p]rovide for the engineering, design, contract preparation, purchasing, construction, reconstruction, repair, retirement, replacement, supervision, training, expediting, inspection, testing, start-up, protection, operation, maintenance and accounting of, or with respect to, each component.

---

**1.** *See Ferguson v. Williams,* 670 S.W.2d 327, 331 (Tex.App.—Austin 1984, writ ref'd n.r.e.) (managing partner held not liable for mismanagement of a joint venture despite six specific acts of negligence); *accord, Marcus v. Green,* 13 Ill. App.3d 699, 300 N.E.2d 512, 520 (1973) (partner responsible for violation of scaffolding safety statute entitled to indemnity from partnership as risk inherent in partnership business); *Charlton v. Sloan,* 76 Iowa 288, 41 N.W. 303, 304 (1888) (partner not charged with loss resulting from unwise lease); *Hurter v. Larrabee,* 224 Mass. 218, 112 N.E. 613, 614 (1916) (partner with duty to supervise books not charged when there was only "mere negligence" in failure of

duty to supervise); *Thomas v. Milfelt,* 222 S.W.2d 359, 365 (Mo.App.1949) (partner not charged with losses unless they result from fraud, culpable negligence, or bad faith); *J.E. Crosbie, Inc. v. King,* 192 Okl. 53, 133 P.2d 543, 546 (1943) (partners assume risk of loss that comes from bad judgment); *Knipe v. Livingston,* 209 Pa. 49, 57 A. 1130, 1130 (1904) (deceased partner who had been lax in collecting accounts and had carried bad debts as assets was not charged with resulting losses); *Binning v. Miller,* 55 Wyo. 478, 102 P.2d 64, 76 (1940) (absent fraud, culpable negligence, or bad faith, cotenant who acted in good faith not liable for exercising poor judgment).

Austin relies on the "provide for" language in this provision to make its assertion that the parties' intended to impose an implied duty of skill and care on HL & P's performance. Austin asserts that this language specifically and expressly delegates to HL & P, as project manager, the ability to control or to manage the matters pertaining to engineering, design, purchasing, construction, quality assurance, selection of contractors, and operation of the project.

The term "provide for" does not necessarily impose strict contract liability. *See Sherman Simon Enters. v. Lorac Serv. Corp.*, 724 S.W.2d 13, 16 (Tex.1987). In *Sherman Simon*, the court held that an automobile rental agency satisfied an agreement to provide insurance coverage for one of its customers when it secured a policy from an insurance company. *Id.* Here, Austin introduced no evidence that shows that the parties had the intent or contemplated that HL & P would design and/or construct the project itself. Accordingly, HL & P fulfilled its obligations pursuant to section 10.2.4 when it contracted with Brown & Root and Westinghouse to perform those services as independent contractors. *See Seaview Hosp., Inc. v. Medicenters of Am., Inc.*, 570 S.W.2d 35, 39–40 (Tex.Civ.App.—Corpus Christi 1978, no writ) (distinguishing between a contract to "furnish" services and a contract to "perform" services).

Although the participation agreement does not specifically state that the management committee has "general supervision" of the project, the agreement does specifically provide that the management committee has the right to:

(1) resolve disputes among the participants arising under the agreement (§ 9.3.5);

(2) review and act upon the project manager's recommendations concerning:

a. the utilization of employees (§ 9.3.6.2),

b. the annual budget for capital expenditures (§ 9.3.6.3),

c. the operating practices and procedures (§ 9.3.6.11);

(3) remove the project manager with a simple majority vote (§ 25); and

(4) approve all agreements (§ 31).

Based on these contract provisions, we conclude that the management committee's powers are not limited and that the management committee, not HL & P, maintains ultimate control over the project.

### Exculpatory Clause

Austin contends that the trial court in its first opinion misconstrued the participation agreement because the participation agreement's exculpatory clause does not absolve HL & P of its implied duty to use skill and care. Austin argues that its claim against HL & P for mismanagement is a contract claim, not a claim for "tortious conduct." Austin further argues that the exculpatory clause is too vague to be enforceable.

 An action in contract is for the breach of a duty arising out of a contract, either express or implied. An action in tort is for a breach of a duty imposed by law. *International Printing Pressmen & Assistants' Union v. Smith*, 145 Tex. 399, 409, 198 S.W.2d 729, 735 (1947). Where the plaintiff may not maintain a cause of action without proving the contract's contents, and the action's gist is the breach of the contract, whether by malfeasance or nonfeasance, it is an action on the contract. *Smith*, 145 Tex. at 409, 198 S.W.2d at 735; *Manzo v. Ford*, 731 S.W.2d 673, 677 (Tex. App.—Houston [14th Dist.] 1987, no writ). This categorization of the claim is true though it is labeled an action for negligent performance. *Manzo*, 731 S.W.2d at 677.

██ Austin's action is for damages for HL & P's failure to perform its duties as project manager with reasonable skill and care, a duty Austin asserts is impliedly imposed on HL & P by the contract regardless of the parties' intention. The right for which Austin seeks redress arose by virtue of the parties' agreement. We conclude that Austin's action is founded upon contract. *See Smith*, 145 Tex. at 410, 198 S.W.2d at 736.

Section 21 of the participation agreement, the tortious conduct exculpatory clause, provides in pertinent part:

Participants shall have no remedies against another Participant for tortious conduct arising out of the ownership of the South Texas Project, or any portion thereof, or out of Preconstruction Work, Construction Work or Station Work except when the claim results from Willful Action.

Because this exculpatory clause precludes only actions based on tortious conduct, it is inapplicable in this situation.

### Duty of Implied Skill and Care Summation

Because (1) the duty of reasonable care and skill is not implied in all contracts, (2) the agreement does not provide HL & P with independent contractor status or state that HL & P is responsible for results obtained, (3) it is not necessary to infer the duty to carry out the contract's full purpose, (4) the limited use of "best judgment" does not necessarily imply a general duty of reasonable skill and care, (5) HL & P is motivated by self-interest, and (6) the management committee maintains ultimate control over the project, the trial court did not err when it sustained HL & P's special exceptions and struck Austin's cause of action alleging that HL & P had breached its duty implied in law to perform its obligations as project manager under the participation agreement with skill and care. We overrule Austin's first point of error.

### HEARSAY

In its fourth point of error, Austin contends that the trial court erred when it overruled Austin's hearsay objection to the admission of three newspaper articles. Austin argues that:

(1) the articles were relevant only if the statements made by the officials were true,

(2) the articles allowed the jury to infer that the reporter believed the statements, which belief may have been erroneous,

(3) HL & P's repeated references to and quotations from the articles, during jury argument, established harm and caused the probable rendition of an improper verdict.

HL & P contends that it offered the newspaper articles to show that the information Austin denied receiving was available in the city's newspapers at the relevant times. HL & P claims that the articles were not hearsay because they were admitted to show that Austin was on notice about the project's problems and to show the state of the public's knowledge in the City of Austin, not to prove the truth of the matters asserted in the articles. HL & P argues that (1) during voir dire and in its opening statement, Austin told the jury that it intended to offer evidence about the state of public knowledge in the city, (2) Austin fulfilled this promise through the presentation of many witnesses who claimed not to have known information about the project and who testified that had HL & P made the information available they would have acted differently, (3) HL & P used two of the articles to put in context Austin's mayor's testimony about the statements she made to the Austin public following the airport meeting, and (4) any error in these articles' admission was harmless because the articles' contents were cumulative of other evidence.

For the reasons discussed below, we overrule Austin's fourth point of error.

### Standard of Review

To get a reversal of judgment based on the trial court's error in admitting or excluding evidence, the complaining party must show that (1) the trial court committed an error and (2) the error was reasonably calculated to cause and probably did cause rendition of an improper verdict. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). Further, the party must show that the whole case turned on the admission of the unexcluded evidence. *Shenandoah Assocs. v. J & K Properties*, 741 S.W.2d 470, 490 (Tex. App.—Dallas 1987, writ denied). When a trial court gives an instruction that limits the purpose for which the jury can consider the evidence, this Court must assume that the jury properly followed the trial court's

instruction. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex.1982). The erroneous admission of evidence that is merely cumulative of properly admitted evidence is harmless error. *McInnes v. Yamaha Motor Corp.*, 673 S.W.2d 185, 188 (Tex.1984), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). To make this determination, this Court must review the entire record. *Gee*, 765 S.W.2d at 396.

 Hearsay is an out-of-court statement offered as evidence to prove the truth of the matter asserted. TEX.R.CIV. EVID. 801(d); *Matter of Honsaker*, 539 S.W.2d 198, 201 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.). Generally, Texas courts consider newspaper articles inadmissible hearsay. *Deramus v. Thornton*, 160 Tex. 494, 505, 333 S.W.2d 824, 831 (1960); *Sherrill v. Estate of Plumley*, 514 S.W.2d 286, 290 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.); *Hearn v. Covington*, 22 S.W.2d 1073, 1073 (Tex.Civ.App.—Beaumont 1929, no writ). When a party offers a statement simply to show that it was made rather than to show its truth or falsity, however, the hearsay rule does not bar its admission. *Pope v. Darcey*, 667 S.W.2d 270, 273 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Further, newspaper articles not offered for the truth of the matters asserted but used merely to show notice of those matters are not hearsay. *See Hiram v. United States*, 354 F.2d 4, 7 (9th Cir.1965). The hearsay rule also does not bar the admissibility of news reports used to show public perceptions of the subject matter covered by the articles. *See Tejas Gas Corp. v. Herrin*, 705 S.W.2d 177, 180–81 (Tex.App.—Texarkana 1985), *rev'd on other grounds*, 716 S.W.2d 45 (Tex.1986); *Lone Star Gas Co. v. Smith* 405 S.W.2d 238, 239 (Tex.Civ. App.—Waco 1966, no writ); *King v. City of Dallas*, 374 S.W.2d 707, 711–12 (Tex.Civ. App.—Dallas 1964, writ ref'd n.r.e.); *see also Democratic Party v. National Conservative Political Action Comm.*, 578 F.Supp. 797, 829 (E.D.Pa.1983), *aff'd in part and rev'd in part on other grounds*, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985).

*"Nuclear woes muffled?"*

AUSTIN AMERICAN STATESMAN, November 30, 1978

 HL & P first discussed the November 30, 1978 newspaper article during the cross-examination of R.L. Hancock, Austin's representative on the management committee. The article discussed various problems at the project and alleged that Hancock did not timely relay the information he received concerning those problems to the city council. The article included quotations from several Austin City Council members, listed the problems, and included Hancock's explanations for why he had limited the information he relayed concerning those problems.

Austin objected to this article's introduction, arguing that the headline and the quotations contained in the article were hearsay. HL & P responded that it was introducing the article only to show that accusations were made against Hancock and the gravity of those accusations, not to show that any of the statements in the article were in fact accurate. The court at first overruled the objection, but later sustained a similar objection and instructed the jury that the statements in the article, made by persons other than Hancock, were not admitted for the truth of the statements, but only to show that the statements were made and that the matter had the attention of the city council. HL & P questioned Hancock further about whether the article made accusations that he did not inform Austin's City Council about the problems at the project. HL & P did not refer to or question Hancock about any specific quotation in the article.

HL & P stated that its intention in introducing the article was to show that Austin's City Council had made accusations against Hancock and not to show the article's truth or falsity. The hearsay rule, therefore, did not bar the article's admission. *Pope*, 667 S.W.2d at 273. Further, the trial court instructed the jury to consider the article only for that purpose. We assume that the jury followed the instruc-

tion. *Brookhollow*, 642 S.W.2d at 167. Austin points to no evidence showing that the jury failed to follow the court's limiting instruction.

If the court committed error by allowing the introduction of this article, the error was harmless because this evidence merely was cumulative of evidence admitted afterward. *McInnes*, 673 S.W.2d at 188. HL & P later introduced and read, without objection, most of a memo Hancock sent Austin's city manager responding to his request for further information on the November 30 article. Other than the quotations, the memo contained the same information as the article about the council's accusations.

Because the trial court limited the use of the article to show that the city council had made accusations against Hancock, and we assume that the jury followed the court's instruction, the article was not barred by the hearsay rule and the trial court did not err when it allowed the article's admission. If the hearsay rule, however, did bar the article's admission, the error was harmless because the evidence was cumulative of other evidence admitted without objection.

*"Council unimpressed by report after HL & P briefing on STNP"*

DAILY TEXAN, November 21, 1978

■ HL & P introduced the November 21, 1978 newspaper article during its cross-examination of Carole McClellan Rylander, Austin's mayor in 1978. The article discussed the briefing that Austin City Council members received from HL & P at the meeting at the airport in Houston a few days earlier. The article included quotations from Rylander and other council members and summarized HL & P's statements at the airport meeting. Further, it conveyed that, despite HL & P's statements at the airport meeting, Austin's council members continued to have questions about the project's cost and schedule.

HL & P introduced the article in response to Rylander's statement that she would have to look specifically at the clippings from that time to see what she had said to the public upon her return from the meeting in Houston. Austin immediately objected to the article's admission on hearsay grounds. The trial court sustained the objection and instructed the jury that the newspaper article was not admitted for the truth of any matters stated in it, but only for the purpose of showing what the discussion was in the City of Austin at the time the account was published. HL & P continued questioning Rylander about specific quotes she had allegedly made in the article and read a portion of the article to the jury. Austin again objected complaining, "[T]his has nothing to do with any discussion that's taken place in Austin." The trial court overruled Austin's objection. HL & P continued questioning Rylander, limiting itself to the portion of the article read to the jury and Rylander's quotations. In its jury argument, HL & P repeated some of Rylander's alleged quotations from the article. HL & P made no reference to quotations made by the other city council members.

HL & P introduced the November 21 newspaper article to show what Austin's citizens were reading at that time concerning the project. The hearsay rule, therefore, did not bar the article's admission. *See Tejas Gas Corp.*, 705 S.W.2d at 180–81. The trial court instructed the jury to consider the article only for that purpose, and we assume the jury followed that instruction. *Brookhollow*, 642 S.W.2d at 167. The evidence does not show that HL & P went beyond its stated purpose or that the jury failed to follow the court's limiting instruction. Additionally, the article summarized HL & P's statements at the airport meeting, a transcription of which Austin introduced during its direct examination of Rylander. Because the trial court limited the use of the article to show what Austin's citizens were reading at the time, and we assume the jury followed that instruction, the article was not barred by the hearsay rule and the trial court did not err when it allowed the article's admission. If the court did err in allowing the introduction of this article, the error was harmless since the evidence was cumulative of other evidence admitted without objection.

*"City officials delayed telling council about Nuke troubles"*

AUSTIN AMERICAN STATESMAN,
January 31, 1982

 HL & P introduced the January 31, 1982 newspaper article during its examination of Lee Cooke, Austin's mayor at the time of trial and a former Austin City Council member. The article discussed the communication problems among Hancock, Austin's City Manager's office, and Austin's City Council. It included quotations from Hancock, Rylander, and other Austin officials.

After HL & P read the article's headline to Cooke and commented that Hancock's picture accompanied the article, the following exchange occurred:

Q: Still having troubles between the City Council and the representative to the management committee on the City Council complaining that they never got the word on what was going on down at the South Texas Project; is that correct, Mayor?

A: I was not there. I can't make an assumption that this reporter accurately portrayed what happened.

Q: Well, right next to this picture of Mr. Hancock, Mr. Hancock is quoted as saying, R.L. Hancock says the City Manager's office should pass news to the council. Is that right, sir?

A: That's what that says.

HL & P asked no further questions concerning this article nor made any further references to it.

When HL & P introduced the November 21 and 30, 1978 newspaper articles, Austin requested and received an instruction to the jury to consider those articles only for the limited purpose of showing what the discussion was in the City of Austin at the time the account was published. Austin did not request a limiting instruction either at the time HL & P introduced this newspaper article or at pretrial.

When the jury should consider the tendered evidence for only one purpose, it is the opponent's burden to secure a limiting instruction. Absent such a request, the admission of the evidence without limitation is not a ground for complaint on appeal. TEX.R.CIV.EVID. 105(a); *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 642 (Tex. 1987).

Because Austin did not request a limiting instruction, it waived its right to complain. Assuming that Austin did not waive its right to complain, any error was harmless. There were two previous limiting instructions given with the November 21 and 30 newspaper articles and the witness's testimony accompanying the introduction of the article questioned the article's accuracy. We hold that the lack of a limiting instruction did not amount to such a denial of Austin's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case. TEX.R.APP.P. 81(b)(1).

### Hearsay Summation

The trial court admitted the November 21 and 30 newspaper articles for the limited purpose of showing that the statements were made and for the limited purpose of showing the state of public knowledge in the City of Austin at the relevant times. Thus, the articles were not hearsay. When Austin did not request a limiting instruction with the January 31 newspaper article, it waived its right to complain about its admission in its entirety. Alternatively, if Austin did not waive its right to complain, any error in admitting the article was harmless.

Because Austin waived its right to complain of the admission of the January 31 newspaper article and because we assume that the jury followed the trial court's instructions and appropriately limited its consideration of the remaining articles, the hearsay rule did not bar the articles' admission. Therefore, the trial court did not err in allowing the articles' admission into evidence. We overrule Austin's fourth point of error.

## JURY CHARGE

In its second and third points of error, Austin contends that an erroneous jury charge caused the jury to render an improper verdict. Austin argues that the trial court erred when it refused to include (1) section 10.2.7 of the participation agreement in the definition of HL & P's duties to inform and (2) a "substantial factor" question or instruction in the causation issue.

## Standard of Review

■■■■■ Under the Texas Rules of Civil Procedure, the trial court must, whenever feasible, submit the cause upon broad-form questions and must give proper instructions and definitions to enable the jury to render a verdict. Tex.R.Civ.P. 277. Explanatory instructions are the tools that aid the jury in rendering a just and proper verdict. The trial court should submit instructions only when it determines that the instructions will help the jury to understand the meaning and effect of the law and the presumption created thereby. *Texaco Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 819 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed*, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). The complaining party must tender to the court in writing a substantially correct definition or instruction. Tex.R.Civ.P. 278. The trial court has wide discretion to determine the sufficiency of definitions and instructions. *K–Mart Corp. Store No. 7441 v. Trotti*, 677 S.W.2d 632, 636 (Tex.App.—Houston [1st Dist.] 1984), *writ ref'd n.r.e. per curiam*, 686 S.W.2d 593 (1985). To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings, the evidence presented, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav.*, 710 S.W.2d 551, 555 (Tex.1986). We will deem an alleged error reversible only if, when viewed in light of the totality of the circumstances, it amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment. Tex.R.App.P. 81(b)(1); *Island Recreational Dev.*, 710 S.W.2d at 555; *Geotech Energy v. Gulf States Telecommunica-*

*tions & Info. Sys., Inc.*, 788 S.W.2d 386, 390 (Tex.App.—Houston [14th Dist.] 1990, no writ).

## HL & P's Contractual Duty to Make Recommendations

■■■■ In its second point of error, Austin contends that the trial court erred when it refused to include section 10.2.7 of the participation agreement in the definition of HL & P's duties to inform. Austin argues that, under section 10.2.7, HL & P had a duty to make competent recommendations to the management committee. Austin asserts that it supported its request to include section 10.2.7 with written pleadings and proof that HL & P did not make competent recommendations concerning (1) the choice of a nuclear steam supply system, (2) the selection of Brown & Root, and (3) the decision to start safety-related construction.

HL & P argues that jury question one dealt with whether HL & P provided information to the management committee and that the duty to make recommendations did not fall within the participation agreement's definition of information. HL & P further argues that Austin never objected to the omission of section 10.2.7 in the pretrial opinions listing the participation agreement sections imposing informational duties.

The court limited its charge to those sections of the participation agreement that it determined mandated HL & P to provide information. The charge included the following definition and instruction:

'Information required by the Participation Agreement' means the information that HL & P was required to supply to the Participants by the following provisions of the Participation Agreement.

10.2 The Project Manager for all aspects of the South Texas Project, except the construction, operation, and maintenance of the Construction Power Line, shall:

10.2.3 Supply the Participants with copies of all studies made, license and

permit applications filed, and licenses and permits obtained;

 10.2.5 Promptly supply the Participants with information on major matters and significant factors which affect construction and operating schedules;

 10.2.6 Provide the Management Committee and any committee created by it with all necessary records and information pertaining to matters within its [the Management Committee's] designated responsibilities.

 10.2.10 Keep the Participants fully and promptly advised of material changes in conditions or other material developments affecting the performance of its [HL & P's] responsibilities.

In answering question 1, 2, and 3, you should consider only HL & P's duty to supply the information required by the foregoing provisions of the Participation Agreement; do not consider any other duties that HL & P may have had as project manager.

Austin requested that the trial court include a portion of section 10.2.7 as follows:

 10.2.7 Prepare recommendations covering the matters which are to be reviewed and acted upon by the Management Committee.

The trial court refused Austin's request.

In its entirety section 10.2.7 reads as follows:

 10.2.7 Prepare recommendations covering the matters which are to be reviewed and acted upon by the Management Committee *and any committee created by the Management Committee for the purpose of reviewing such recommendations, including, but not limited to, insurance coverages to be obtained during the periods covered by and with respect to Preconstruction Work, Construction Work and Station Work, or any phases thereof.*

(Emphasis added.) Although section 10.2.7 states that the project manager shall make recommendations to the management committee, we must read that section in conjunction with section 9.3.6, which sets forth the management committee's responsibility concerning the recommendations. Section 9.3.6 further defines and limits the project manager's recommendation duties to the areas of insurance, employee utilization, budgets, and the making of policies and procedures for the plant's construction, maintenance, and operation. When sections 9.3.6 and 10.2.7 are read together, it is clear that the language "but not limited to" in section 10.2.7 refers back to section 9.3.6. The first subsection under 9.3.6 specifically refers to insurance coverage. The remaining fifteen subsections define the other areas on which the management committee expected HL & P to make recommendations.

Austin's proposed instruction implied a general duty by HL & P to make recommendations. The proposed instruction, however, did not properly place HL & P's duty in context. When section 10.2.7 is read in its entirety and in conjunction with section 9.3.6, we conclude that HL & P's duty to make recommendations was limited to the sixteen specific areas set forth in section 9.3.6. Austin's proposed instruction, therefore, would not have aided the jury in understanding HL & P's duty to supply Austin with information or the law or in rendering a just and proper verdict. *See Texaco,* 729 S.W.2d at 819–20. Because Austin's proposed instruction would not have aided the jury in understanding the law or in rendering its verdict, the trial court did not err in refusing to submit the instruction to the jury. We overrule Austin's second point of error.

### "But For" v. "Substantial Factor" Causation

■ In its third point of error, Austin contends that the trial court erred in submitting the question on causation. Austin argues that the language "in reasonable probability" that the trial court used in jury question two erroneously applied "but for" causation to the question of increased costs. Austin asserts that the applicable burden of proof in contract cases is "substantial factor" causation and that "but

for" causation requires a higher burden of proof.

To show liability for damages in a breach of contract case, the plaintiff must show that the defendant's breach was a "substantial factor" in causing the injury. 5 CORBIN, CORBIN ON CONTRACTS § 999 (1964). The plaintiff need not show the proportionate fault of each wrongdoer. *White Budd Van Ness v. Major–Gladys Drive*, 798 S.W.2d 805, 819–20 (Tex.App.—Beaumont 1990, writ dism'd), *cert. denied*, —— U.S. ——, 112 S.Ct. 180, 116 L.Ed.2d 142 (1991); *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933, 938 (Tex.App.—Dallas 1987, writ denied).

Question two of the court's jury charge read as follows:

> Were any costs incurred in the construction of [the project] that, in reasonable probability, would not have been incurred if HL & P had furnished to the Participants all the information as and when required by the Participation Agreement?

The jury responded "No." No definition or instruction concerning causation accompanied this question.

Austin requested that the trial court include the following question in the jury charge:

> Was HL & P's failure to supply information to Austin, if you have found that it did so fail, a substantial factor in increasing the cost of the South Texas Project?

The trial court refused Austin's request. Austin also requested that the trial court include the following instruction in connection with question two and/or three:

> HL &. P's failure(s), if any, to supply information caused an increase in cost if they were a substantial factor in bringing about that result.

The trial court also refused this request.

Austin fails to cite, and we cannot find, any authority for its propositions that the term "in reasonable probability" has the same meaning as "but for" causation or that the precise term "substantial factor" must appear in the jury issue. On its face, the issue submitted by the trial court does not impose a stricter standard than Austin's requested issue or instruction. No significant difference exists between the submitted issue and the requested issue or instruction. Because the submitted issue imposed the correct standard concerning causation, and Austin's proposed instruction would not have aided the jury in understanding the law or in rendering its verdict, the trial court did not err when it refused Austin's requested question and instruction. We overrule Austin's third point of error.

## MOTION FOR NEW TRIAL

In its fifth and sixth points of error, Austin contends that the trial court erred when it overruled Austin's motion for new trial because the jury's findings that Austin did not incur any costs as a result of HL & P's failure to provide information and that any deceptive trade practice or unconscionable conduct by HL & P did not adversely affect Austin are against the great weight and preponderance of the evidence. Austin argues that (1) starting safety-related construction too soon caused cost overruns, (2) safety-related construction started too soon on the project, (3) HL & P knew that the project was not ready to start safety-related construction in April 1976, (4) HL & P misinformed Austin about the project's readiness to start safety-related construction, and (5) HL & P's misinformation caused cost overruns on the project that would otherwise not have been incurred.

### Standard of Review

When determining a factual sufficiency point of error, this Court must consider and weigh all the evidence in the case. It should set aside the verdict and remand the cause for a new trial only if it concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of probative force in support of the verdict. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). This Court, however, is not a factfinder. We do not

pass upon the witnesses' credibility or substitute our judgment for that of the trier of fact, even if there is conflicting evidence that would support a different conclusion. *Harco Nat'l Ins. Co. v. Villanueva*, 765 S.W.2d 809, 810 (Tex.App.—Dallas 1988, writ denied). The existence of some evidence of probative force in support of the verdict, however, does not mean that the verdict is not contrary to the overwhelming weight of all the evidence. *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

### Failure to Provide Information— Jury Question No. 2
### *Evidence Contrary to Jury Finding*

■ In its fifth point of error, Austin contends that the following evidence is contrary to the jury's finding that HL & P's failure to furnish information to Austin about the inadequacy of Brown & Root's engineering to support safety-related construction did not cause any increase in the cost of the project:

(1) Robert Allen, a consultant for Austin and former head of power plant construction for Bechtel, testified that, when nuclear projects begin safety-related construction, costs tend to increase dramatically.

(2) Because there were too few engineering drawings to support the safety-related construction, work was performed out of sequence, which contributed to inefficiencies, rework, loss of efficient use of personnel, increased costs, and schedule delays.

(3) When HL & P received the project's construction permit in 1976, structural engineering could not support construction.

(4) All of the participants, other than HL & P, hired Gibbs and Hill, a well-recognized A/E, to study the baseline estimate prepared by the task force composed of HL & P, Brown & Root, and Management Analysis. The Gibbs and Hill study reported, "At the time construction was initiated, engineering was behind schedule in issuing construction drawings and subsequent issues were not far enough ahead of construction needs to support the ongoing construction program efficiently."

(5) HL & P's sworn answers to interrogatories sent by Brown & Root during the Brown & Root litigation read, "HL & P believes that Brown & Root construction went to the field too early." "The number of design drawings prepared was totally inadequate to support construction efficiently. If candid reports concerning the amount of engineering completed at the end of 1975 had been given to the management committee, it is likely that construction would not have started in the spring of 1976 and a key project mistake would have been avoided." "HL & P believes the fact that [Brown & Root] engineering and design work was never able to support construction, inevitably caused project work to proceed in a manner involving waste and inefficiency." "In truth, 60 percent of the engineering had not been completed by the latter part of 1975 but rather, probably not in excess of five to ten percent of the engineering necessary to support construction had been completed and the percentage may have been ... materially smaller."

(6) The 1977, 1978, and 1979 Management Analysis reports concluded that the project began safety-related construction too soon.

(7) HL & P discussed for hours with Brown & Root the decision whether to start safety-related construction in 1976 for hours with Brown & Root and knew that it was a calculated risk.

(8) Brown & Root started safety-related construction only at HL & P's request.

(9) Despite knowing that only sixty percent of the engineering was complete, HL & P recommended to the management committee that safety-

related construction begin on the project.

(10) At the March 12, 1976 management committee meeting, Brown & Root, when asked whether engineering could support the project construction schedule, responded "Hell, yes," even though it knew that response was untrue.

(11) If Austin had known that Brown & Root's engineering was inadequate to support the safety-related construction in April 1976, Austin would have recommended either that the work on the project stop until Brown & Root's engineering could catch up with construction and find solutions for and fix the problems or that the project be canceled.

(12) If the other participants had indicated that they were not ready to start safety-related construction or were not willing to vote for it, then HL & P would not have been able to start safety-related construction.

(13) Each day the project was delayed, the project's cost increased by $750,000 based on the carrying costs of the investment, which included interest on the money borrowed, the cost of the support staff, and the cost of keeping the construction force on the job, and the cost of replacement power.

*Evidence Supporting Jury Finding*

The following evidence supports the jury's finding:

(1) Donley Jordan, HL & P's chief executive officer and chairman of the board, testified, "Everybody in the Houston Lighting & Power Company organization who had anything to do with the South Texas Project felt it was the right thing to do to go forward with safety related construction, and that there was no undue risk involved in it." He also stated that no one at Brown & Root told HL & P that Brown & Root believed it was extremely risky to begin safety-related construction in spring 1976. He also testified that HL & P took the position during the Brown & Root litigation that starting safety-related construction was a key project mistake because at that time no one knew what it would take to complete a nuclear power plant and that HL & P had asked its lawyers to draft a petition as broad as they thought the participants had a chance to prove. He also stated that, looking back, he knew of no one who has done a detailed study on the project that said that the project should not have started safety-related construction at that time. He further testified that at the time the decision was made to start safety-related construction, all the participants had the same information as HL & P.

(2) Ed Turner, HL & P's general manager of power plant engineering and construction for the project, and Ralph Hernandez, an HL & P engineer, testified that they had no concern in March 1976 about Brown & Root's engineering being adequate to support safety-related construction. Hernandez also testified that sufficient engineering drawings were available and that no problems occurred in 1977 through 1980 that resulted from the failure to have sufficient engineering drawings complete at the time safety-related construction began in April 1976.

(3) Brown & Root did not tell HL & P that its engineering was inadequate to support safety-related construction. At the April 1976 management committee meeting, Brown & Root told HL & P that engineering was sixty-three percent complete and purchasing was twenty-two percent complete.

(4) The project met every scheduled construction activity in 1976. These acts could not have occurred without having sufficient engineering drawings available.

(5) The decision to start safety-related construction was made in September 1975 when the management committee was reviewing the utilization of the limited work authorization permit.

(6) No inefficient cost, inordinate amount of rework, or inordinate amount of work performed out of sequence was a result of beginning the safety-related construction work in April 1976.

(7) Based on the critical path analysis, work on the project progressed at a better than average or at an average rate for comparable plants built during that time until late 1979. This indicates that the engineering was adequate to support construction up to 1980.

(8) Darrell Halligan, Bechtel's vice president for the project's operations, testified that the amount of engineering that Brown & Root had available prior to beginning safety-related construction was comparable to other nuclear projects that he had supervised.

(9) Jack Mooney, Brown & Root's engineering manager and the person who told the participants at the March 12, 1976 management committee meeting that Brown & Root was ready to begin safety-related construction, testified that there were adequate engineering drawings available to start safety-related construction in April 1976. He also testified that his speech to the management committee and the decision to start safety-related construction was made by him without influence from either Brown & Root's management or HL & P personnel.

(10) Robert Traylor, Management Analysis's cofounder, testified that his company found no cost or schedule problems that resulted from beginning safety-related construction in 1976.

After considering all of the evidence, we conclude that the jury's finding that any failure to provide information did not cause excess project costs is not against the great weight and preponderance of the evidence. The evidence, therefore, supports the jury's finding. Because the jury's finding that any failure to provide information did not cause excess project costs is not against the great weight and preponderance of the evidence, the trial court did not err when it overruled Austin's motion for new trial. We overrule Austin's fifth point of error. Because of our disposition of Austin's fifth point of error, we need not address HL & P's first conditional cross-point requesting this Court to affirm the trial court's judgment as to Austin's breach of contract claim.

### Austin's DTPA Claims

In its sixth point of error, Austin argues that HL & P's unconscionable conduct adversely affected Austin. On appeal, Austin appears to rest its DTPA claim solely on HL & P's conduct in relation to the decision to begin safety-related construction in 1976.

An "unconscionable action or course of action" means an act that (1) takes advantage of a consumer's lack of knowledge to a grossly unfair degree or (2) results in a gross disparity between the value received and consideration paid. TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon 1987); *Chastain v. Koonce*, 700 S.W.2d 579, 582 (Tex.1985). Taking advantage of a consumer's lack of knowledge to a grossly unfair degree requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated. *Chastain*, 700 S.W.2d at 584. A gross disparity between value received and consideration paid means a glaring and flagrant disparity. *Id.* at 583. A consumer's proof of gross unfairness and gross disparity does not require proof that the defendant acted intentionally, knowingly, or with conscious indifference. *Chastain*, 700 S.W.2d at 583.

### *Evidence Contrary to Jury Finding*

Austin relies on the same evidence set forth above under its fifth point of error to

support its argument here that the jury's finding that HL & P's unconscionable conduct did not affect Austin was against the great weight and preponderance of the evidence.

### Evidence Supporting Jury Finding

 The following evidence supports the jury's finding that HL & P did not take advantage of Austin to a grossly unfair degree:

(1) Management Analysis did not base its statement that Brown & Root began safety-related construction too soon on the fact that there were an inadequate number of engineering drawings or engineering studies. Rather, Management Analysis repeated a statement made by Knox Broom, one of Brown & Root's senior vice presidents, at the September 21, 1978 management committee meeting, that the engineering drawings were only eight percent complete at the time Brown & Root started safety-related construction, thus propagating a myth, which others repeated without performing additional analysis or studies, that Brown & Root was not prepared to start safety-related construction when it did.

(2) Brown & Root's statement in 1976 that sixty percent of the engineering was complete was accurate considering the information available at that time. Brown & Root based its statement on an estimate that the project would take two million engineering man-hours to complete and that Brown & Root had used sixty percent of those man-hours at that time. By 1978, the estimate of engineering man-hours grew to twenty million. In hindsight, this meant that Brown & Root had actually completed less than eight percent of the engineering before beginning safety-related construction. Broom based his statement on the revised engineering man-hour estimate.

(3) Kleinrath reached his conclusion that Brown & Root's engineering was inadequate to start safety-related construction based on only four or five engineering drawings provided by Austin's lawyers.

(4) Mooney, Brown & Root's engineering manager in April 1976, testified that neither Management Analysis nor Gibbs and Hill ever discussed with him whether Brown & Root's engineering was sufficient to begin safety-related construction. Prior to testifying, he reviewed all the engineering drawings produced by Brown & Root up to March 12, 1976. By March 12, 1976, almost 700 engineering drawings were complete or issued.

(5) Ralph Hernandez, an HL & P engineer whose responsibilities in 1976 included providing HL & P with an overview of Brown & Root's structural engineering, reviewed the drawings available before April 1976. Based on this review, he testified that engineering was sufficient to support construction. He further testified that engineering did not fall behind construction until the first quarter of 1978.

After a review of the evidence, we conclude that (1) the jury heard evidence that, at the time the decision was made to start safety-related construction, HL & P believed that Brown & Root's engineering was sufficient to support safety-related construction and (2) any statements HL & P made to that effect were not unconscionable in a manner that would take unfair advantage of Austin. We further conclude that the true percentage of engineering drawings completed by Brown & Root in March 1976 could only be determined in hindsight at the end of the project. HL & P had to base its decision on the information available at the time.

The following evidence supports the jury finding that there was not a gross disparity between the value of the plant that Austin received and the consideration it paid:

(1) Of the plants available for Austin to use to generate electricity, the project is the cheapest to operate. Utilities

place into operation the cheapest plants first.

(2) In its 1973 generating plan, Austin determined that the cost of electric energy was the result of capital investment, fuel, maintenance, and operations. Its goals in its 1987 generating plan were to:

—meet long-term customer demand;

—provide electricity with adequate reliability;

—minimize the cost of generating electricity to the rate payers; and

—diversify energy resources.

(3) Without the project, Austin would pay $40–$100 million/year more to operate its system. Over the project's lifetime, this adds up to an $11.6 billion savings (represented to the jury as $2.5 billion in 1989 dollars).

(4) Austin will experience savings as a result of the project's reliability. Reliability means the frequency with which outages will occur, the number of customers affected, and how long those outages will last. Without the project, these events will occur more frequently and be of longer duration. Austin's target energy reserve was twenty percent. Without the project, there will be several times that its reserve will fall below that number. The project's reliability value equals $6.7 billion ($1.2 billion in 1989 dollars).

(5) Austin's cost to build and operate the project for a lifetime is $9.065 billion ($3.375 billion in 1989 dollars). This amount includes: the amount that Austin will pay to service its debt; Austin's share of the total capital cost to build the project, less Austin's share of the Brown & Root settlement; the cost to operate the project over its useful lifetime, which includes routine maintenance, operating personnel, and nuclear fuel; capital additions, which includes upgrading the plant and insuring continual compliance with quality and safety requirements; and the cost of decommissioning the plant.

(6) Based on fuel savings and reliability only, the project's lifetime value to Austin exceeds its costs by $9.206 billion ($357 million in 1989 dollars).

(7) In addition to fuel and reliability savings, the project also added diversity to the types of plants available to Austin to generate electricity.

(8) It would have cost Austin $432 million (in 1989 dollars) more to own and operate a coal plant over its lifetime.

After a review of the evidence, we conclude that the jury could have found that the project's value to Austin exceeds Austin's share of the construction costs. Because the evidence shows that HL & P did not take advantage of Austin's lack of knowledge and that no disparity exists between the value Austin received and the consideration it paid, the jury's finding that no deceptive trade practice or unconscionable act by HL & P adversely affected Austin is not against the great weight and preponderance of the evidence. We overrule Austin's sixth point of error. Because of our disposition of Austin's sixth point of error, we need not address HL & P's second cross-point concerning whether Austin is a "consumer" as to HL & P as defined by the DTPA or whether HL & P is liable for any DTPA violations by Brown & Root.

## CONCLUSION

Because (1) the duty of reasonable skill and care is not implied in the participation agreement, (2) the newspaper articles are not hearsay, (3) the jury charge was proper, (4) the jury's findings are not against the great weight and preponderance of the evidence, and (5) the trial court properly denied Austin's motion for new trial, the trial court committed no reversible errors. We overrule all of Austin's points of error.

We affirm the trial court's judgment.