**Affirm and Opinion Filed April 6, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-01513-CV

## REBECCA POTTER, INDIVIDUALLY AND AS NEXT FRIEND OF AUSTYN VASQUEZ, A MINOR, AND RICHARD POTTER, Appellants

## V.

## HP TEXAS 1 LLC D/B/A HPA TX LLC, ET AL., Appellees

**On Appeal from the 382nd Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 1-18-1376**

## MEMORANDUM OPINION

Before Justices Schenck, Molberg, and Reichek
Opinion by Justice Molberg

Rebecca Potter, individually and as next friend of Austyn Vasquez,[1] and

Richard Potter challenge the trial court's rendition of a take-nothing summary

judgment on their fraudulent concealment, fraud, Deceptive Trade Practices Act

(DTPA), negligent misrepresentation, negligence, negligence per se, and breach of

contract claims against HP Texas 1 LLC d/b/a HPA TX LLC (HPA), SER Texas

LLC d/b/a Hyperion Homes Texas LLC, Home Partners of America, Inc., and

---

[1] Austyn is Rebecca's son from a prior marriage.

OPVHHJV LLC d/b/a Pathlight Property Management (Pathlight) (collectively, HPA parties), and on their negligence and negligent misrepresentation claims against Coats Group Real Estate Co. d/b/a/ CGC Construction (Coats). While the Potters assert five issues on appeal, the central issue before us is whether an unambiguous "as is" provision in a residential lease with an option to purchase precludes the Potters' claims. We conclude the "as is" provision is enforceable and negates the essential element of causation of their claims. We affirm the trial court's judgment.

## BACKGROUND

The Potters' suit arises out of illness and injuries allegedly caused by toxic mold in a house they leased from HPA, with an option to purchase. In 2015, the Potters began looking for a home to purchase in the Rockwall, Texas area. Richard had credit issues from his prior divorce. While researching their options, Rebecca found a real estate agent, Lori Aguirre, who introduced the Potters to a program offered by HPA which provides a pathway to home ownership for consumers unable to secure a traditional home loan. Under this program, after the consumer's application is approved, HPA purchases a house selected by the applicant and leases it to the applicant with the option to purchase the house at a later date. Pathlight, a property management company owned by HPA, manages HPA's leased properties. HPA provides the details of the house selected by the applicant to Pathlight and to US Inspect, a third-party inspection company. Pathlight coordinates US Inspect and

an HPA-approved contractor to conduct an inspection and make the repairs deemed necessary by the inspection report. In this case, Coats was the contractor selected by Pathlight to walk through the house with the inspector and to make repairs.

After their application to HPA was approved for a certain sum, Aguirre's assistant, James Mudd, took the Potters to see properties, including the house that is the subject of this lawsuit (Kings Pass house). Before requesting HPA to purchase the Kings Pass house, the Potters walked through it. Rebecca's deposition testimony reflected that because the house did not have electricity on their first visit, they could not see it well. After Mudd took Rebecca to see the house again "[in] the daylight," the Potters informed Aguirre and Mudd they wanted to proceed with the Kings Pass house. The Potters did not hire their own inspector and no one prevented them from doing so. According to Rebecca, "We were told that the inspection was done on [HPA's] end and that . . . we do not do an inspection on the home until the time of purchase." Rebecca testified:

> We were instructed that there was going to be an inspection and so forth. And that if the inspection [had] issues, it would be addressed, whatnot, was our understanding. So then we were continuously told that we were not allowed to see the inspection report. But assuming—my husband and I assumed, that if there was something wrong, of course, they would tell us. And at least without seeing the report, they would notify us. . . . So we did not hear that there was [sic] any issues, so at that point we went ahead and said we'd like to proceed on with the home.

On May 13, 2015, Rebecca and Richard, as tenants, and HPA, as landlord, entered into a lease agreement with a right to purchase clause which, if exercised,

–3–

allowed the Potters to buy the Kings Pass house with a specified credit applied to the purchase price. Under the lease agreement, Pathlight was HPA's property manager and agent. The Potters signed four documents agreeing to accept the house "AS-IS, WHERE-IS, WITH ALL FAULTS": the Residential Lease Agreement (Lease), a Residential Right to Purchase Agreement (Right to Purchase Agreement), a Repair, Maintenance & Improvement Addendum To Residential Lease & Right To Purchase, and a Real Estate Sale Contract. Paragraph nine of the seventeen-page Lease (not including attachments) stated:

> 9. MOVE-IN CONDITION OF PREMISES. Tenant represents, agrees and warrants that Tenant has inspected the Premises and acknowledges that the Premises are in good order, repair and in a safe, clean and habitable condition. No representations as to the condition or repair of the Premises have been made by Landlord prior to or at the execution of this Lease that are not contained in this Lease. Tenant will be provided with a Move-In Condition form ("Condition Form") for the Premises on or before the Commencement Date and, within 3 Business Days after the Commencement Date, Tenant must sign and return to Landlord or Landlord's Agent (as requested) the Condition Form on which Tenant must note all defects or damage relating to the Premises (except to the extent caused by or on behalf [sic] Tenant or an Occupant). . . . Except for the covenants of Landlord expressly contained in this Lease, and the other written documents among the parties pertaining to the Premises, and as otherwise specified by Applicable Laws, (a) Tenant hereby represents, warrants and acknowledges that it is leasing the Premises in its "AS-IS, WHERE-IS, WITH ALL FAULTS" condition as of the date of this Lease and specifically and expressly without any warranties, representations or guarantees, either express or implied, as to its condition, fitness for any particular purpose, merchantability, habitability or any other warranty of any kind, nature, or type whatsoever from or on behalf of Landlord . . . .

Paragraph forty of the Lease reiterated the Potters were taking the house with no warranties of any kind, including the warranty of habitability:

> 40. ENTIRE AGREEMENT; MODIFICATION. . . . Landlord and Tenant expressly agree that . . . there are and shall be no implied warranties of merchantability, habitability, suitability, fitness for a particular purpose or of any other kinds arising out of the Lease or the Premises, all of which are hereby waivd by Tenant . . . .

Attachment D to the Lease, also signed by Rebecca and Richard, included "State (Texas) and Federal Disclosures" which addressed, among other things, asbestos, lead-based paint, and mold. The mold clause stated:

> Mold is naturally occurring and may cause health risks or damage to property. If Tenant is concerned or desires additional information regarding mold, Tenant should contact an appropriate professional.

The Right to Purchase Agreement included a "Condition of Premises" clause containing the same "AS-IS, WHERE-IS, WITH ALL FAULTS" language as the Lease:

> 2. CONDITION OF PREMISES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OTHER DOCUMENT EXECUTED BY SELLER PURSUANT TO THIS AGREEMENT OR THE EXECUTED PURCHASE CONTRACT AND TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW, (A) PURCHASE RIGHT HOLDER, FOR ITSELF AND ON BEHALF OF PURCHASER, HEREBY REPRESENTS, WARRANTS AND ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PREMISES IN ITS "AS-IS, WHERE-IS, WITH ALL FAULTS" CONDITION AS OF THE DATE OF EXECUTION OF THE EXECUTED PURCHASE CONTRACT AND THE CLOSING DATE AND

SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, HABITABILITY OR ANY OTHER WARRANTY OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER; (B) SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PREMISES . . . . PURCHASE RIGHT HOLDER ACKNOWLEDGES AND AGREES THAT: (I) THE PURCHASE PRICE WAS NEGOTIATED WITH THE EXPRESS UNDERSTANDING THAT PURCHASE RIGHT HOLDER IS RESPONSIBLE FOR ALL PROPERTY MAINTENANCE NEEDS OF THE PREMISES PURSUANT TO THE LEASE (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE LEASE TO THE CONTRARY), THIS AGREEMENT AND THE EXECUTED PURCHASE CONTRACT . . . .

The first paragraph of the Repair, Maintenance & Improvement Addendum To

Residential Lease & Right To Purchase stated:

1. Tenant has agreed to accept possession of the Premises in its current AS-IS, WHERE-IS, WITH ALL FAULTS condition, and except as expressly set forth in the Agreements or as provided by Applicable Laws, Landlord has no obligation to repair, improve, alter or remodel the Premises.

Finally, the Real Estate Sale Contract stated:

7. PROPERTY CONDITION: . . . B. ACCEPTANCE OF PROPERTY CONDITION: This Contract is for the sale of the real estate and property (including fixtures, equipment and personal property) in its "AS IS, WHERE IS, WITH ALL FAULTS" condition, and Purchaser acknowledges and agrees that . . . (b) the sale of the Property is without any representations or warranties by Seller, including, without limitation, habitability or fitness for a particular purpose . . . .

After signing the Lease and related agreements, but prior to moving in, Rebecca and Richard went into the house when they "drove by [and] saw that there were workers there" making repairs. Rebecca testified:

> So my husband and I went in. And that is when we spoke to the head contractor. They were walking through the house and then he told us that we were not supposed to be there. . . . And we asked, why wouldn't we be able to be there if we're purchasing the home? And he said that it's just policy, we're not to be there. And when he had told us that, I had just opened the downstairs bedroom, slash, office door, and noticed [that] room had not been touched whatsoever. And I asked him, well, are you going to paint this room? And then my husband and I saw bubbling [on] and . . . deformity of a wall. And then on the opposite wall, there was a lot of black coming out of a cable socket. And we asked him about that. He said that was dirt due to no one living there for quite a while. And that the wall issue was due to clogged gutters, so that he would have that cleaned.

A couple of days before the Potters moved in, they inspected the house again and saw "the dirt was removed from the wall socket" and the wall had been "stuccoed" and painted. Richard was present when "the carpet gentleman [was] pulling the carpet up in the master bedroom, and there was like, black underneath the carpet." When Richard asked what the black substance was, "the carpet gentleman said that was [the] previous owner's dog feces." Richard offered to personally pay for a new carpet pad when the carpet repairman said "all new padding . . . was not in the [repair] allowance."

The Potters moved into the house on May 25, 2015, and almost immediately started having problems, including a broken air conditioning system and

malfunctioning appliances. In June, Sam Jang from Pathlight conducted a walkthrough inspection of the house with the Potters and documented their concerns, including more black substance coming out of the cable receptacle in the wall and a leak within a wall. Jang contacted Coats and requested further repairs but Coats did not return to the house or make any further repairs.

Rebecca testified that after living in the house for several months, she became ill and suffered flu-like symptoms, blurry vision, skin blisters and inflammation, itchiness, fatigue, memory loss, migraine headaches, bone and joint pain, loss of mobility, sinus problems, nail fungus, depression, and stuttering. Shortly after Rebecca's symptom began, Austyn became ill, suffering flu-like symptoms, bone and joint pain, body aches, migraine headaches, and depression. Rebecca and Austyn visited physicians, who were unable to diagnose the cause of their symptoms. Richard lost business and wages during Rebecca's illness, as he cared for her and took her to doctor appointments.[2] Ultimately, Richard had to close his business and seek new employment to support his family.

In January 2016, the Potters confirmed the presence of toxic mold in the house after hiring a mold specialist and an inspector at the suggestion of a neighbor. The Potters moved out of the house, staying at a hotel before they moved in with friends.

---

[2] Richard also sustained skin blisters after moving into the house. At his deposition, Richard testified he traveled for work and the blistering cleared up when he was traveling.

On March 17, 2017, the Potters executed a Lease Termination Agreement effective as of that date, terminating the Lease and Right to Purchase Agreement.

On June 1, 2016, the Potters filed suit against the HPA parties and subsequently added Coats as a defendant. Their live petition asserted claims for fraudulent concealment, fraud, DTPA violations, negligent misrepresentation, negligence, negligence per se, and breach of contract against the HPA parties, and claims for negligence and negligent misrepresentation against Coats. The HPA parties and Coats moved for traditional and no-evidence summary judgment on several grounds, including: the "as is" clause defeated the causation element of the Potters' claims; the Potters had actual knowledge of the defects subject of their lawsuit; the Potters contractually waived all claims against HPA and its agents for their alleged injuries; the Potters contractually agreed to "obtain insurance and look solely to that insurance for any recovery" on their claims; and the Potters had no evidence of one or more of the essential elements of their claims. Coats additionally moved for summary judgment based on the economic loss doctrine because the Potters did not have a contract with Coats.[3] In a letter opinion dated July 5, 2018, the trial court granted summary judgment in favor of appellees expressly based on

---

[3] Coats was not party to the Lease or related agreements and he was not hired by the Potters to make repairs to the house. Nor did the Potters assert claims against Coats based on third-party beneficiary status. The US Inspect report did not indicate the Kings Pass house had mold, and the Potters do not claim Coats had either a duty to inspect the house for mold or "direct knowledge" of the existence of mold before they signed the Lease and related agreements.

its findings that the "as is" clause defeated the causation element of the Potters' claims and there was no evidence appellees had actual knowledge of—or attempted to conceal—the presence of mold; the inspection report prepared by US Inspect at HPA's request did not show the presence of mold so it would not have alerted the Potters to the presence of mold if they had received a copy; and there was no evidence the Potters were prevented from inspecting the house on their own. The trial court entered its order granting summary judgment on September 21, 2018. The Potters' motion for new trial, filed on October 16, 2018, was denied by operation of law. This appeal followed.

## APPLICABLE LAW

*Standard of Review*

A party may move for a no-evidence summary judgment if there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). No-evidence summary judgment is proper when:

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). To defeat a no-evidence motion, the nonmovant must produce more than a scintilla of probative evidence raising a genuine issue of material fact as to each challenged element of its cause of action. *Id.* If the nonmovant fails to do so, the trial court must grant a no-evidence summary judgment motion. *See* TEX. R. CIV. P. 166a(i). "Less than a scintilla of evidence exists when it is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem., Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

To prevail on a traditional motion for summary judgment, a movant must conclusively establish there is no genuine issue of material fact and, therefore, the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex. 1982). If the movant establishes its right to judgment as a matter of law, then the burden shifts to the nonmovant to either present evidence raising a genuine issue of material fact by producing more than a scintilla of evidence regarding the challenged element, or conclusively prove all elements of an affirmative defense. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). More than a scintilla of evidence exists when reasonable and fair-minded jurors could

differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

If both traditional and no-evidence summary judgments are before us, we generally first look at the no-evidence motion. *First United Pentecostal Church of Beaumont, d/b/a the Anchor of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017) (when party moves for both traditional and no-evidence summary judgments, reviewing court first considers no-evidence motion); *Ford Motor Co. v. Ridgeway*, 135 S.W.3d 598, 600 (Tex. 2004).  In our de novo review, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex. 2006).  If the nonmovant fails to meet its burden under the no-evidence standard, there is no need to address the traditional motion. *Merriman*, 407 S.W.3d at 248.  Any claims that survive the no-evidence review then undergo review under the traditional standard. *Parker*, 514 S.W.3d at 219–20.  When the trial court does not specify the grounds upon which it granted summary judgment, we must affirm if any of the independent summary judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000).  However, when, as in this case, the trial court explicitly specifies the ground upon which it granted summary judgment, we affirm only if the theory relied upon is meritorious; otherwise the case must be remanded to allow the trial court to rule on the remaining

asserted grounds. *State Farm Fire & Casualty Co. v. S.S.*, 858 S.W.2d 374, 381 (Tex. 1993).

*The Enforceability of "As Is" Provisions*

Generally, an "as is" clause negates the causation and reliance elements in DTPA, fraud, negligence, and breach of contract claims, as a matter of law. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 160 (Tex. 1995); *CAS, Ltd. v. TM Aviation Partners, LP*, No. 05-15-00779-CV, 2016 WL 4151455, at *6 (Tex. App.—Dallas Aug. 4, 2016, no pet.) (mem. op.); *Williams v. Dardenne*, 345 S.W.3d 118, 123–24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). *Prudential* involved the enforceability of the following "as is" provision in a commercial real estate contract for the purchase of an office building:

> As a material part of the consideration for the Agreement, Seller and purchaser agree that Purchaser is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. Purchaser acknowledges that it is not relying on any representation, statement or other assertion with respect to the Property condition, but is relying upon it examination of the Property . . . .

*Prudential Ins. Co. of Am.*, 896 S.W.2d at 160. Two years after purchasing the building, the buyer learned it contained asbestos and sued the seller alleging DTPA violations, fraud, negligence, and breach of the duty of good faith and fair dealing. The trial court entered judgment on a jury verdict in favor of the buyer and the court of appeals affirmed. Concluding the buyer's agreement to purchase the property "as

–13–

is" precluded him from proving the causation element of his claims, the supreme court reversed the judgment of the court of appeals and rendered judgment that the buyer take nothing on his claims. The court explained, "By agreeing to purchase something 'as is,' a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong." *Id.* at 161; *see also Williams*, 345 S.W.3d at 124 ("This evaluation on the part of the buyer constitutes a new and independent basis for the purchase, one that disavows any reliance on representations made by the seller."). In such case, the seller gives no assurances, express or implied, concerning the value or condition of the thing sold, and the buyer chooses to rely completely on his own determination of the condition and value of the purchase, removing the possibility that the seller's conduct will cause him damage.[4] *Prudential Ins. Co. of Am.*, 896 S.W.2d at 161. The "sole cause" of a buyer's injury in this circumstance "is the buyer himself":

> [The buyer] has agreed to take the full risk of determining the value of the purchase. He is not obliged to do so; he could insist instead that the seller assume part or all of that risk by obtaining warranties to the desired effect. If the seller is willing to give such assurances, however, he will ordinarily insist upon additional compensation. Rather than pay more, a buyer may choose to rely entirely upon his own determination of the condition and value of his purchase. In making this choice, he removes the possibility that the seller's conduct will cause him damage.

---

[4] As in the case before us, the terms of a typical "as is" agreement also disclaim the existence of any express or implied warranties. *See Prudential Ins. Co. of Am.,* 896 S.W.2d at 161 (citing TEX. BUS. & COM. CODE § 2.316(c)(1)).

*Id.*

However, there are exceptions to the general rule. A buyer is not bound by an "as is" provision that is the product of fraudulent representation or concealment by the seller. *Id.* at 162. Nor is a buyer bound by an "as is" provision if he is entitled to inspect the condition of what is being sold but is prevented from doing so by the seller's conduct. *Id.* ("In circumstances such as these[,] an 'as is' agreement does not bar recovery against the seller."). In determining the enforceability of an "as is" provision, we also consider the totality of the circumstances surrounding the agreement, such as whether the "as is" clause is an important part of the basis of the bargain, rather than an incidental or boilerplate provision, and whether the parties have relatively equal bargaining positions. *Id.*

## ANALYSIS

Causation is an essential element of each of the Potters' theories of liability. Negligence, negligence per se, negligent misrepresentation, and fraud require proof of proximate cause. *Prudential Ins. Co. of Am.*, 896 S.W.2d at 160–61 (negligence); *Aranda v. Willie Ltd. P'ship*, No. 03-15-00670-CV, 2016 WL 3136884, at *1 (Tex. App.—Austin June 1, 2016, no pet.) (mem. op.) (negligence per se); *Affordable Power, L.P. v. Buckeye Ventures*, 347 S.W.3d 825, 830 (Tex. App.—Dallas 2011, no pet.) (negligent misrepresentation); *S & I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 856 (Tex. App.—Dallas 2011, no pet.) (fraud). Claims brought under the DTPA require a showing of "producing cause." TEX. BUS. & COM. CODE § 17.50(a);

*Prudential Ins. Co. of Am.*, 896 S.W.2d at 161. Causation also is an essential element for breach of contract and fraud by nondisclosure claims. *CAS, Ltd.*, 2016 WL 4151455, at *6 (breach of contract); *Mead v. Gray*, No. 02-16-00177-CV, 2017 WL 1738066, at *4 (Tex. App.—Fort Worth May 4, 2017, pet. denied) (mem. op.) (fraud by nondisclosure). Accordingly, all of the Potters' claims require proof the complained-of conduct was a substantial factor giving rise to the injury which otherwise would not have occurred. *See Mack Trucks, Inc.*, 206 S.W.3d at 582 (proximate and producing causation requires showing defendant's conduct was substantial factor in causing injury); *City of Austin v. Houston Lighting & Power*, 844 S.W.2d 773, 795 (Tex. App.—Dallas 1992, writ denied) (breach of contract claim requires showing breach was substantial factor in causing the injury); *Frost Nat'l Bank v Heafner*, 12 S.W.3d 104, 110 n.4 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (same); *see also Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) ("Fraud by nondisclosure is simply a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts.").

On appeal, the Potters do not dispute the Lease and related agreements contain an "as is" clause that ordinarily would preclude them from recovering on their claims. Instead, they maintain the trial court erred in granting summary judgment because the summary judgment evidence raised fact issues regarding the enforceability of the "as is" provision. In issues one through four, the Potters

challenge the trial court's traditional summary judgment against them; their fifth issue challenges the trial court's no-evidence summary judgment.

In their first issue, the Potters argue the "as is" clause is not binding on them because: (1) the HPA parties "were more sophisticated in real estate" than they were; (2) the "as is" clause was "buried in lengthy agreements full of boilerplate provisions"; (3) "the agreements did not expressly disclaim reliance upon any representations"[5]; and (4) the HPA parties "knowingly concealed material facts." In their second issue, the Potters contend the "as is" clause is not binding on them because they did not have actual knowledge of mold in the house and the HPA parties concealed or failed to disclose the existence of mold. In their fifth issue, the Potters contend the summary judgment evidence established all of the challenged elements of their claims. To raise a fact issue on the enforceability of the Lease's "as is" clause, the Potters were required to adduce more than a scintilla of evidence to support their arguments in response to the HPA parties' and Coats' motions for summary judgment. We conclude the summary judgment evidence did not raise a

---

[5] Because a valid "as is" clause negates the causation and reliance elements of DTPA, fraud, negligence, and breach of contract claims relating to the condition of the property, and we conclude the "as is" clause in the Lease is enforceable, we do not separately address the Potters' argument with respect to reliance. *See Prudential Ins. Co. of Am.*, 896 S.W.2d at 161; *CAS, Ltd.*, 2016 WL 4151455, at *6; *Williams*, 345 S.W.3d at 124.

fact issue pertaining to the enforceability of the "as is" clause, and the causation element of their claims was defeated as a matter of law.[6]

### The Conditions the Subject of the Potters' Claims Were Visible or Discoverable by Inspection

As a preliminary matter, we note the summary judgment record shows the presence of mold in the house was not confirmed until January 2016, approximately seven months after the Potters moved in. The inspection report generated by US Inspect and provided to Coats did not indicate the presence of mold, and there is no evidence in the record the HPA parties otherwise were aware there was mold in the house. Before they entered into the Lease and related agreements, Rebecca walked through the house twice and Richard walked through the house once. After signing the Lease but prior to moving in, the Potters visited the house again and saw "black substance" on the wall and coming out of a wall socket. Rebecca testified she saw "bubbling" and "deforming" of a wall that, according to a workman, was caused by "clogged gutters." In a subsequent visit prior to moving in, Richard saw "black underneath the carpet" being removed by a carpet repairman. When they were told by workmen the black substance was dirt and dog feces, the Potters did not further investigate. There is no indication in the record they took a closer look at the black

---

[6] Because we conclude the "as is" provision is binding on the Potters, we need not address their third and fourth issues, in which they argue, respectively, the trial court erred because they "had the required insurance in place," and because the economic loss rule does not bar their claims against Coats for damages that are not the subject of a contract.

substance to verify it was dirt or dog feces. Nor is there evidence they alerted or questioned their real estate agent, Pathlight, or HPA about the black substance, the clogged gutters, or the wall deformity. The Potters did not hire an inspector to conduct an independent inspection, and the HPA parties did not prevent them from doing so. Although the Potters were not provided a copy of the US Inspect report, there is no evidence they asked to see it until long after they moved in, even after personally observing black substance on the wall, coming out of a wall socket, and underneath a carpet, as well as "bubbling" and "deformity" of a wall purportedly caused by clogged gutters and, therefore by implication, water damage.

Rather, knowing they were taking the property "as is," the Potters moved into the house. By taking the house "as is," the Potters agreed to make their own appraisal of the property and accept the risk they may be wrong; and their independent examination of the house and the visibility of the black substance and wall deformity precludes a showing of causation. *See Lim v. Lomeli*, No. 04-06-00389-CV, 2007 WL 2428078, at *4 (Tex. App.— San Antonio Aug. 29, 2007, no pet.) (mem. op.) (holding buyers could not prove causation or reliance on their real estate agent's alleged misrepresentations and nondisclosures regarding water damage to house when agent and buyers had same information available to them: visible damage and information disclosed in buyer's inspection report). Based upon the evidence before us, we conclude the conditions subject of the Potters' claims were visible or discoverable by inspection, and the Potters did not present more than

a scintilla of evidence the HPA parties knew anything more or different than they did about the condition of the house.

We now turn to the question of whether the "as is" clause in the Lease should not be enforced due to the surrounding circumstances, the imbalance in the parties' sophistication in real estate contracts, and/or because the HPA parties and Coats fraudulently misrepresented and concealed material facts.

*Surrounding Circumstances and Sophistication of the Parties*

The Potters contend the "as is" clause in the Lease is not binding on them because the HPA parties were "more sophisticated in real estate" than they were, and because the "as is" clause was "buried in lengthy agreements full of boiler plate [sic] provisions."

We will not dispute the "as is" clause in the Lease and related agreements were boilerplate provisions, and there is no indication in the record that the terms of the Lease were negotiated. However, we are not convinced the Potters were so unsophisticated that enforcing the provision would be inequitable. HPA is a large, national company that specializes in rent-to-own residential real estate transactions and undoubtedly has a great deal of sophistication vis-à-vis many buyers in those transactions. The Potters, however, did not face the HPA parties alone. During their dealings with the HPA parties, they were represented by Aguirre, who owned her own real estate agency. Also, Richard was no stranger to contracts. His deposition testimony reflected that at the time he moved into the Kings Pass house, he owned a

–20–

business that contracted with manufacturers in various industries to build and "automate facilities" and he owned another business that specialized in "robotics."

Far from being inconspicuous, the "AS-IS, WHERE-IS, WITH ALL FAULTS" provision was prominent and set in all capital letters for emphasis in the Lease (in paragraph nine), Right to Purchase Agreement (in paragraph two), Real Estate Sale Contract (in paragraph seven), and Repair, Maintenance & Improvement Addendum (in paragraph one)—all four of which were signed on the same day by both Rebecca and Richard. Moreover, under paragraphs nine and forty of the Lease, the Potters expressly leased the house with no warranties of any kind, including merchantability, habitability, suitability, or fitness for a particular purpose. The Lease included an "Attorney Review" clause acknowledging the Lease had been "freely negotiated by both parties" and the Potters had the opportunity to consult with an attorney regarding its terms. On April 21, 2015, the Potters signed a "Document Review Acknowledgement" (Acknowledgement) representing they "completely read and voluntarily accept[ed] the terms and conditions of" the Lease, Right to Purchase Agreement, and Acknowledgement. The Potters do not claim they were not aware of the "as is" provision, and their acknowledgement they read the provision is significant because "every person [with legal] capacity . . . is held to know what words were used in the contract, to know their meaning, and to understand their legal effect." *Amouri v. Sw. Toyota, Inc.*, 20 S.W.3d 165, 169 (Tex.

–21–

App.—Texarkana 2000, pet. denied).  For the same reasons, we do not believe the "as is" provisions was not an important basis of the bargain.

Under these circumstances, we conclude the Potters are not entitled to have the "as is" clause set aside on the grounds they were unsophisticated purchasers agreeing to boilerplate provisions.

*Fraudulent Representation and Concealment*

The Potters also contend the "as is" clause is not enforceable because the HPA parties and Coats fraudulently misrepresented and concealed material facts, including a statement in the HPA "Standards Acknowledgment Form" that "every effort will be made to address known life-safety, mechanical and critical maintenance issues"; a statement on HPA's website that "they inspect the homes to guarantee a happy, healthy and safe family dwelling"; and a number of "deficiencies" identified in the US Inspect report "including with the roof, ceilings and floors, walls and windows" and "indications of past water leaks" on specified ceilings.  The Potters also claim they understood they would be "contact[ed] if there were any issues regarding the inspection" but, instead, the HPA parties "intentionally denied [them] a copy of the US Inspect report" and "told [the Potters they] were not to have the house inspected until the time of their actual purchase" in order to conceal these defects.  They further complain that although the US Inspect report recommended a roofer be consulted for further evaluation of necessary roof

repairs, the HPA parties and Coats "never hired or consulted with a professional roofer."

In order to set aside the "as is" clause on the basis of fraudulent misrepresentation, the Potters must show appellees had actual knowledge the representation was false or fraudulent at the time it was made. *Prudential Ins. Co. of Am.*, 896 S.W.2d at 162 (refusing to set aside "as is" clause because "[w]hile there may be evidence Prudential should have suspected the presence of asbestos[,] there is no evidence [Prudential] actually knew of the asbestos" and "[a] seller has no duty to disclose facts he does not know"). On appeal, the Potters concede they "never claimed Appellees had direct knowledge of the existence of mold prior to Appellants entering into the Agreements." And under *Prudential*, the HPA parties had no duty to investigate the presence of mold in the house. *Id.* at 162–63 ("Absent any specific knowledge of asbestos in the [building], Prudential was not obligated to raise the subject."). The US Inspect report did not indicate there was mold in the house; and any knowledge by appellees that there may have been water leaks in the house at some point in time does not equate to knowledge of the presence of mold.

Moreover, while Rebecca testified it was her "understanding" that she and Richard would be told if there were "issues" with the inspection and they were told they "do not do an inspection on the home until the time of purchase," the Lease and related addendums signed by the Potters explicitly stated: the Potters "inspected the Premises and acknowledg[e] that the premises are in good order, repair and in a safe,

clean and habitable condition"; HPA has made "[n]o representations as to the condition or repair of the Premises . . . prior to or at the execution of th[e] Lease"; the Potters were leasing the house in its "AS-IS, WHERE-IS, WITH ALL FAULTS" condition and "specifically and expressly without any warranties, representations or guarantees, either express or implied, as to its condition . . . habitability or any other warranty of any kind"; and the Potters should "contact an appropriate professional" if they were "concerned or desire[d] additional information regarding mold." The Lease further stated that the Lease and Lease addendums, Right to Purchase Agreement, and Document Review Acknowledgement constituted the "complete and entire agreement" between the parties and "no representations or oral statements of either party [were] binding unless contained" therein.

Even when every reasonable inference is indulged in their favor, the Potters failed to present more than a scintilla of evidence the HPA parties knew anything more or different than the Potters did about the presence of mold in the house or fraudulently concealed or made fraudulent misrepresentations regarding the conditions of the house the subject of the Potters' claims. To the contrary, record evidence shows the Potters had ample opportunity to inspect the house; and they, in fact, observed a black substance that may have been mold on the wall and deformity of a wall while the HPA parties did not. That is all that is required to defeat the elements of causation.

We are not unsympathetic to the Potters' case. The summary judgment evidence indicates Rebecca became seriously ill while living in the Kings Pass house, and she and Richard went to great lengths to diagnose the cause of symptoms so debilitating that she, at times, was unable to care for her child. Austyn, too, suffered serious symptoms that rendered him unable to attend school—symptoms that were alleviated when he left the Kings Pass house to visit his father. The summary judgment evidence also indicates the possibility that while appellees did not know or conceal that the Kings Pass house had toxic mold, a mold inspection might have revealed the presence of mold. But under *Prudential* and the terms of the Lease, the HPA parties had no duty to investigate the presence of mold in the house. *Prudential Ins. Co. of Am.*, 896 S.W.2d at 162–63. Moreover, Addendum D to the Lease included a mold clause that expressly advised the Potters to "contact an appropriate professional" if they were "concerned or desire[d] additional information regarding mold." Because there is no evidence of intentional misrepresentation or fraudulent concealment by the HPA parties, the Potters are not entitled to have the "as is" clause set aside on either of those bases.

We conclude the Potters failed to raise a fact issue as to the enforceability of the "as is" clause, and the trial court properly determined the "as is" clause negated the causation element of the Potters' claims against appellees as a matter of law. We resolve the Potters' first, second, and fifth issues against them.

Having resolved the Potters' first, second, and fifth issues against them, we need not address their third and fourth issues.  We affirm the trial court's judgment.


/Ken Molberg//
———————————————
KEN MOLBERG
JUSTICE


181513f.p05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

REBECCA POTTER, INDIVIDUALLY AND AS NEXT FRIEND OF AUSTYN VASQUEZ, A MINOR, AND RICHARD POTTER, Appellants

No. 05-18-01513-CV

V.

HP TEXAS 1 LLC D/B/A HPA TX LLC, ET AL., Appellees

On Appeal from the 382nd Judicial District Court, Rockwall County, Texas Trial Court Cause No. 1-18-1376.

Opinion delivered by Justice Molberg. Justices Schenck and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 6th day of April, 2020.